2025 IL App (1st) 191525-U

No. 1-19-1525

Order filed January 24, 2025

Fifth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT
_____

| | | |
|---|---|---|
| ADVANCE IRON WORKS, INC., | ) | Appeal from the |
| | ) | Circuit Court of |
|     Plaintiff-Appellee and Cross-Appellant, | ) | Cook County. |
| | ) | |
|   v. | ) | No. 13 L 9267 |
| | ) | |
| CONTEGRA CONSTRUCTION COMPANY, LLC, | ) | |
| | ) | Honorable |
|     Defendant-Appellant and Cross-Appellee. | ) | Bridget A. Mitchell, |
| | ) | Judge Presiding. |

_____

JUSTICE NAVARRO delivered the judgment of the court.
Presiding Justice Mikva and Justice Oden Johnson concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The trial court did not err when it rejected defendant's collateral attack, *res judicata*, and collateral estoppel affirmative defenses and when it denied defendant's motion for judgment notwithstanding the verdict. The trial court did not abuse its discretion when it denied, in part, plaintiff's petition for attorney fees and costs.

¶ 2    In 2011, defendant, Contegra Construction Company, LLC, and plaintiff, Advance Iron

Works, Inc. (AIW), entered into a contract involving metal fabrication for a crime lab in Bellville,

Illinois. In 2012, Contegra filed a replevin action against AIW, seeking replevin of steel and

materials under the contract based on its allegations that it paid AIW for more fabricated steel than AIW had delivered to the project site. Thereafter, in 2013, AIW filed the instant action against Contegra. Following a jury trial, the jury found in favor of AIW on its claims for breach of contract, fraud, trespass, wrongful replevin, defamation, and slander of title. The jury awarded compensatory and punitive damages to AIW. The trial court denied Contegra's motion for judgment notwithstanding the verdict and for a new trial and it granted in part and denied in part AIW's motion for attorney fees and costs.

¶ 3 Contegra appeals, contending that AIW's claims are barred by the collateral attack doctrine, *res judicata*, and collateral estoppel. Contegra also raises numerous issues with the jury's verdict finding in favor of AIW and argues that the trial court erred when it denied Contegra's motion for judgment notwithstanding the verdict. AIW filed a cross-appeal challenging the trial court's order on its motion for attorney fees and costs. This order addresses both the appeal and cross-appeal. For the reasons that follow, we affirm the trial court's order denying Contegra's motion for judgment notwithstanding the verdict as well as its order granting in part and denying in part AIW's motion for attorney fees and costs.

¶ 4                                    I. BACKGROUND

¶ 5 This case involves issues relating to a contractual dispute between AIW and Contegra involving the construction of the Metro East Forensic Lab (project) for the Illinois State Police in Belleville, Illinois. The project was under the direction of the Illinois Capital Development Board (CDB), and Contegra was the general contractor for the project. In December 2011, Contegra and AIW, a steel fabricator, entered into a contract whereby AIW agreed to provide Contegra fabricated steel for the project in exchange for a payment of $1,283,490.

¶ 6    In January 2012, AIW began fabricating and shipping the steel for the project. The original February 28, 2012, steel erection date for the project set forth in the contract was delayed due to issues related to the architectural steel drawings as well as a plumbing problem at the project. Thereafter, in August 2012, Contegra stopped making payments in response to AIW's payment applications, and a dispute arose between the parties relating to Contegra's payments to AIW and whether AIW was timely delivering fabricated steel to the project for the construction of the building.

¶ 7    In October 2012, Contegra filed an action for replevin against AIW, alleging that it was entitled to possession of the steel that AIW failed to deliver to the project site. During the replevin action, AIW filed a petition for bankruptcy in the United States Bankruptcy Court for the Northern District of Illinois, which was eventually dismissed. In August 2013, AIW filed the instant action against Contegra, alleging numerous claims, including wrongful replevin, trespass, fraud, defamation, and slander of title.

¶ 8                    Contegra's Action of Replevin

¶ 9    On October 26, 2012, Contegra filed a complaint against AIW, alleging that despite repeated demand, AIW failed to timely deliver the fabricated materials to comply with the contract and the contemplated timeline for the project. Contegra alleged that it had paid for 50% of the services and materials under the contract and that AIW had delivered only 35% of the fabricated steel under the contract. Contegra alleged that AIW's refusal to timely deliver the fabricated materials and drawings under the contract delayed the completion of the project.

¶ 10    Contegra alleged a claim for replevin of materials, asserting that it was the owner of the undelivered materials and that AIW was in possession of $269,450 worth of materials that had not been delivered to Contegra. In the alternative, Contegra alleged that if the court found that

Contegra was not the owner of the materials, Contegra held a "properly perfected, first-priority security interest" in the materials, as it had filed a UCC-1 financing statement (UCC-1) with the Illinois Secretary of State on February 6, 2012. Contegra also alleged claims for conversion, breach of contract, and unjust enrichment.

¶ 11     On November 2, 2012, the parties entered an agreed order that provided that on November 5, 2012, Contegra's representatives would conduct an inspection at AIW's premises, and if its inspectors were reasonably satisfied with the inspection, it would pay $221,654.40 to AIW by November 6, 2012.

¶ 12     On November 16, 2012, the court entered a written order, finding that Contegra was entitled to possession of certain materials. The record also contains a "Replevin Bond" dated November 16, 2012, and signed by Contegra and Travelers Casualty and Surety Company (Travelers).

¶ 13     On November 19, 2012, the court entered a written order modifying the November 16, 2012, replevin order, which provided that Contegra was not entitled to "replevy any steel unless it has been completely fabricated by AIW and marked to correspond to the project" and it was not entitled to "any steel considered to be work in progress or raw steel." The court also stated that Contegra could replevy final shop drawings for the project but that it could not share shop drawings with any competing steel fabricator for the purpose of fabricating steel for this project. The court also denied AIW's request for an interim stay of enforcement of the order of replevin, and it gave AIW time to file an answer or otherwise plead to the initial complaint.

¶ 14     On November 20, 2012, Contegra proceeded with the replevin. On this same day, AIW filed a petition for relief under chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy Court in the Northern District of Illinois. On November 30, 2012, December 4,

2012, and December 18, 2012, the court entered orders that further modified the November 16, 2012, order.

¶ 15                    Orders and Motions in United States Bankruptcy Court

¶ 16    On December 18, 2012, Contegra filed an adversary complaint against AIW, as the debtor, in the bankruptcy court, alleging claims for, among others, declaratory judgment and injunctive relief. In February 2013, AIW removed the replevin action from the state court to the bankruptcy court (removed adversary). Thereafter, in March 2013, Contegra filed a motion to consolidate the adversary proceedings, in which it requested the bankruptcy court consolidate the original adversary complaint it had filed with the removed adversary and to dismiss certain counts in each complaint.

¶ 17    On April 29, 2013, the bankruptcy court entered a written order dismissing the replevin claim contained in the removed state court action "with prejudice as to Debtor solely with respect to the granting of further relief pursuant to" that count and "without prejudice and with reservation of rights to pursue and enforce all relief previously granted by the State Court" pursuant to the state court's orders.

¶ 18    On July 19, 2013, the United States Bankruptcy Court, Northern District of Illinois dismissed the bankruptcy case.

¶ 19                              AIW's Complaint

¶ 20    In August 2013, AIW filed a complaint against Contegra, and in September 2017, it filed an amended complaint alleging claims for, among others, breach of contract, fraud, trespass, wrongful replevin, conversion, defamation, and slander of title. AIW alleged as follows. In December 2011, Contegra and AIW executed the contract for the steel fabrication for the project. Thereafter, from January 2012 through February 2012, Contegra and AIW communicated about

various issues related to the fabrication process and errors in the architect's design drawings that AIW had discovered while it was preparing its shop drawings.

¶ 21    AIW further alleged that, as a result of the architect's design errors, there was a delay of about five months in fabricating the steel for the project. In August 2012, the State of Illinois and the CDB indicated that it would not pay for the steel fabrication issues related to the design errors. On August 20, 2012, AIW restarted the fabrication process on about one-half of the steel that had been delayed due to the design issues. On September 6, 2012, Contegra informed the State of Illinois that it was "trying to replace AIW as the steel fabricator on the project." Contegra wanted to replace AIW as the fabricator, "in part, as part of a scheme to avoid paying certain change orders out of its own pocket" and to "bring Affton Fabricating into the [p]roject." In October 2012, Contegra made knowingly false statements to the CDB that accused AIW of providing false financial information to and "fraudulently billing Contegra." In November 2012, Contegra represented to the CDB that AIW's agent provided a " 'tremendous amount of false testimony' " in the replevin action and that AIW had "severely overbilled" Contegra.

¶ 22    As for AIW's fraud claim, it alleged that as early as February 2012, when Contegra filed the UCC-1, which AIW did not authorize, and as late as September 7, 2012, Contegra "decided that it no longer wanted to perform under the contract" and "wanted to bring in a new fabricator" for the project. Thereafter, Contegra made numerous false representations to induce AIW to continue fabricating steel and to let AIW believe that it would continue as the fabricator on the project. On October 25, 2012, Contegra informed the State of Illinois that it had terminated AIW from the project, after which it represented to AIW that it wanted to resolve the replevin action consensually so AIW would continue the fabrication work. As a result of Contegra's settlement

representations, AIW signed an agreed order in the replevin action, which allowed Contegra access to AIW's site to conduct an inspection.

¶ 23    As for its trespass claim, AIW alleged that on November 20, 2012, Contegra cut the locks on its gate, entered its property, and then removed AIW's property, some of which was not referenced in the court's replevin order. Neither AIW nor any other entity authorized Contegra to enter AIW's property. Contegra also entered onto AIW's property and removed materials on December 4, 2012, and December 27, 2012, "pursuant to an order of replevin that should not have been issued."

¶ 24    In AIW's wrongful replevin claim, it alleged that in December 2012, Contegra seized certain property from AIW and purported to do so "under the authority of a preliminary order of replevin," which "left unresolved a final determination of whether Contegra was entitled to possession of the subject property."

¶ 25    In AIW's defamation claim, it alleged that Contegra, through its agents, made false statements about AIW to the State of Illinois or the CDB that imputed AIW's integrity and its inability to perform under the contract. As for AIW's slander of title claim, it alleged that less than two months after the parties entered the contract, Contegra knowingly filed with the Illinois Secretary of State a false UCC-1 with malice and intent to disparage AIW's title to the property.

¶ 26                    Affirmative Defenses and Motion for Summary Judgment

¶ 27     In Contegra's affirmative defenses, it alleged, among other things, that AIW did not have a cause of action under the replevin bond, asserting that AIW did not allege that Contegra "failed to prosecute its suit to judgment without delay" and that AIW failed to challenge or appeal any of the replevin orders. It also alleged that the trespass and wrongful replevin claims were an impermissible collateral attack on the replevin orders in the replevin action. The court granted

AIW's motion to dismiss these affirmative defenses with prejudice. In Contegra's motion for summary judgment, it asserted, among other things, that AIW abandoned its wrongful replevin claim and waived any challenges to the replevin orders because it never appealed or challenged those orders in the replevin action. The court denied the motion on this ground, concluding that there was no "final order on the merits" in the replevin action.

¶ 28                                    Trial

¶ 29    At trial, the jury heard testimony from numerous witnesses over the course of a two-week trial. We summarize the testimony below.

¶ 30    Bradley Barnard, Contegra's project executive, testified that the parties executed the contract on December 20, 2011, with a price of $1,283,490. Under the contract, AIW would supply and fabricate steel and Contegra would pay AIW for all fabricated material prior to it being shipped to the job site. The contract also provided that Contegra would pay AIW within 30 days of receiving an invoice, and AIW reserved the right to stop all work if it did not receive payments when due.

¶ 31    In January 2012, AIW informed Contegra that the architect's structural steel drawings were missing information relating to the moment connections, or special connections, which affected both the columns and beams. AIW needed this missing information to start the fabrication for the moment columns. The American Institute of Steel Construction informed Contegra that the architect or engineer of record was responsible for providing AIW with the missing information, but the architect would not provide the data. Contegra retained another engineer to provide AIW with the missing information. This issue with the architect's drawings relating to the moment connections caused design changes and delayed the fabrication and the steel erection date, as the steel had to be shipped and erected in a specific sequence, with the moment columns being erected

first. As for the delay caused by the architect's drawings, Barnard testified that he believed that a fabricator could have taken the drawings and figured out what was required. He also testified that in August 2012, he had stated in Contegra's construction coordination meeting notes that the architect's drawings were "terrible." On August 15, 2012, AIW received the final data it needed to complete the shop drawings, finalize all the complex moment connections, and start the fabrication on the moment columns and beams that were impacted by the design issues.

¶ 32    Barnard testified about AIW's pay applications, Contegra's payments, and change orders that Contegra approved, which brought the contract price to about $1,523,000. The last payment that Contegra made to AIW was on August 8, 2012, at which time it had paid AIW a total of $881,500. Contegra stopped paying AIW because it felt that AIW had "extremely overbilled" and it "wanted to see steel on the job site." He testified that the CDB also "wanted to see the steel on the job site" and "felt they owned the steel." According to Barnard, AIW did not provide Contegra with all the steel for which it had prepaid.

¶ 33    Barnard testified that at an August 17, 2012, "steel accountability meeting," the CDB informed Contegra that it would not pay for the additional costs related to the delay and design changes caused by the missing data in the drawings, and it requested expedited delivery of the steel. On August 29, 2012, Contegra told the CDB that the fabricator had all the questions answered and was in the process of fabrication, and that Contegra would need to further discuss delay and costs after the steel was fabricated. Barnard had no reason to doubt that AIW was in the process of fabrication, and he expected that AIW would be fabricating in September and October.

¶ 34    Barnard also testified that on September 7, 2012, Contegra was "[c]ontemplating" "going to another fabricator" and that Contegra had talked to "Selvaggio Steel," who declined the job. Barnard identified a September 7, 2012, email he sent to the CDB, which stated that Contegra had

"explored every possible option to improve the schedule, including moving to another fabricator" and it had "not been able to find an AISC fabricator that wants to get involved with this project, including Selvaggio Steel." Barnard did not recall whether he ever told AIW that around September 7, 2012, Contegra was looking for another fabricator.

¶ 35    Barnard testified about certain communications between AIW and Contegra that occurred in October 2012. In an October 17, 2022, letter from Contegra's attorney to AIW, Contegra requested AIW to provide adequate assurances that it would deliver the steel by certain dates indicated in the letter, and AIW responded that it would not ship the steel because it did not receive payment. Barnard sent AIW an email on October 18, 2012, which stated that Contegra was "desperate to receive the steel" that AIW had "continually promised to provide" and "[o]ur erector has been unable to progress and it continues to damage us." He testified that, at this point, Contegra was demanding AIW to deliver the steel and was expecting AIW to continue fabricating. The CDB was also pressuring Contegra to get the steel on the job site.

¶ 36    Before Contegra initiated the replevin action on October 24, 2012, it had repeatedly asked AIW to ship the steel for which it had paid. Barnard identified an October 25, 2012, letter he sent to the CDB, which discussed the various problems that Contegra had with AIW and stated that Contegra had "arranged for another fabricator to take over the remainder of the fabrication." The letter also stated that "AIW ha[d] demanded that it be awarded additional amounts through certain change orders," which Contegra felt AIW was not entitled to. Contegra also stated in the letter that AIW was "continuing its pattern here of demanding additional amounts of money to which it is not entitled; if Contegra refuses, AIW simply fails to provide any more steel for the project, as it is doing now."

¶ 37    Barnard testified that when the parties entered the November 2, 2012, agreed order in the replevin action, he knew Contegra was planning on having another fabricator finish the job. Contegra's inspectors at the inspection were Robert Pfeil, who was a part owner of Affton Fabricating & Welding (Affton), and Robert Penn, Contegra's project superintendent. Barnard knew on November 5, 2012, the date Affton performed the inspection at AIW, that Contegra was planning on replacing AIW, and he was not aware whether anyone from Contegra had told AIW that Affton was being considered to replace AIW. Following the inspection, Contegra was not satisfied because the amount of fabricated steel it expected to be at AIW's premises was not there. The report generated after the inspection stated that there was 91.1 tons of steel at AIW's site. According to Barnard, Contegra paid for 66% of the steel for the project based on tonnage for which it did not receive, and at the time of the inspection, it expected 66% of the steel to have been fabricated.

¶ 38    Barnard identified a November 9, 2012, email that he sent to the CDB, which stated that, in the replevin action, Robert Sutphen, who was AIW's vice-president during the relevant time, had "provided a tremendous amount of false testimony to confuse the issue at hand." At a hearing in the replevin action, Sutphen testified that the project required 413 tons of structural steel. According to Barnard, this was false because the project required 550 tons of structural steel. Barnard identified an email he wrote to the CDB on November 13, 2012, which stated that AIW "had severely overbilled and not delivering what we already bought." On November 19, 2012, Contegra terminated AIW based on its failure to perform, and AIW received notice of this termination the next day. Thereafter, Contegra hired Affton as the fabricator to finish the project, who had to fabricate 300 tons of steel for the project. Contegra did not want to terminate AIW because it would cause further delay.

¶ 39    As for the UCC-1 filed against AIW, Barnard testified that, on January 26, 2012, and February 6, 2012, Barnard spoke with an attorney about filing a UCC-1 against AIW. On February 6, 2012, Contegra filed the UCC-1 against AIW with the Illinois Secretary of State, which covered the structural steel, steel decking, metal fabrication, and metal stairs located on AIW's premises. Contegra and AIW did not have a loan agreement and AIW did not consent to the filing. As of February 6, 2012, Barnard did not know whether there was any fabricated steel at AIW's shop. He also testified that on February 4, 2012, a few days before he filed the UCC-1, he had concluded that Contegra needed to hire an engineer to address the missing data on the architect's drawings. In September 2012, AIW requested Contegra to remove the UCC-1, and Contegra's attorney told Barnard that it did not need to be removed. In an October 9, 2012, email, Barnard told AIW that Contegra would lift the UCC-1 if AIW would immediately "[i]dentify our steel and acknowledge ownership of it" and "provide the shop drawings."

¶ 40    Robert Sutphen, a licensed structural and professional engineer and AIW's vice president during the relevant time, testified about the contract terms, including that it provided that Contegra would pay AIW for all fabricated material before it was shipped to the job site and that if AIW did not receive payments, AIW reserved the right to stop all work. On January 20, 2012, AIW submitted a request for information to Contegra because the architect's drawings were missing critical information relating to the moment connections, and under the contract, the engineer of record had to provide this information to AIW. Contegra hired another engineer to address this issue, which took about six months to resolve.

¶ 41    Sutphen testified that between February and April 2012, AIW fabricated steel that was not affected by the missing data, and it shipped seven truckloads of steel. At one point, after discussions between AIW and Contegra about the job site becoming overcrowded, AIW was asked

to stop shipping the steel until the "column matter" resolved. On August 15, 2012, AIW received the missing data on the moment connections that it needed to fully fabricate the moment columns and beams, which must be erected before the first floor can be completed. AIW then obtained the final shop drawings and began fabricating the complex connections.

¶ 42    Sutphen testified about the invoices AIW sent to Contegra. The last invoice paid was on August 8, 2012. At this time, Contegra was overdue in paying its invoices, and it was requesting AIW to send its "drawings" and to ship all of the steel. AIW continued fabricating the steel but once it became clear that Contegra was not going to pay, AIW stopped shipping the steel to encourage Contegra to pay. Sutphen testified that under the contract, AIW could stop shipping if Contegra did not pay, and AIW was "pouring a lot of money into this steel with labor, trying to get this stuff done" and had "incurred a great deal of hundreds of thousands of dollars."

¶ 43    On September 6, 2012, AIW informed Contegra about an approximate schedule of when it thought it could get the first-floor steel delivered. On September 14, 2012, AIW learned that Contegra had filed a UCC-1 against AIW. Sutphen was concerned because the filing could have a "big impact" on AIW. He testified that there was no security agreement, no financing involved, and AIW did not authorize it. On October 8, 2012, Contegra told Sutphen that it would remove the filing when AIW identified "all of our steel and acknowledge[d] that [Contegra] own[ed] it." Sutphen testified at this time, AIW had been fabricating the moment column connections for about one and a half months and was shipping the steel when completed. Contegra wanted the steel as soon as possible, so AIW tried to fabricate it as soon as possible. In September and October, AIW continued fabricating steel and shipped two truckloads of steel.

¶ 44    Sutphen testified that in a phone call with Contegra's counsel on October 26, 2012, Contegra requested a meeting, and Sutphen requested that Contegra come to AIW's premises to

look at the steel, as counting pieces of steel at the job site was inaccurate. On October 29, 2012, Sutphen received an email from Contegra's attorney, which stated that he "remain[ed] interested in discussing further whether there is any possibility to meet to amicably discuss any opportunity of salvaging somewhat the relationship between AIW and Contegra" and that the objective of the meeting would be to "assess the immediate availability of product, and determine, within both parties control, a plan for completion of the steel fabrication for this project, timing of delivery of product, and process for payment or resolution of any claims." Asked what this email meant to him, Sutphen responded that "[s]omeone is going to finally come to our place and see the steel and pay us."

¶ 45    Before the parties entered the November 2, 2012, agreed order in the replevin action, AIW was continuing to work on the project and, according to Sutphen, "[i]t looked like Contegra was finally going to come to our place and check the steel out themselves and see if it looked like it was ready to ship, and then they would pay us." He relied on Contegra's promise to pay "upon reasonable satisfaction of inspecting [AIW's] premises in entering this agreement to let them come to [AIW's] shop." At the November 5, 2012, inspection of AIW's yard pursuant to the agreed order, Pfeil from Affton was present, and Sutphen did not know that Affton had a long-standing relationship with Contegra or that it was AIW's competitor. According to Sutphen, Pfeil understated the amount of steel in AIW's yard in the steel inspection list he generated after the inspection, as he reported AIW had 91.1 tons of fabricated steel in its yard. Sutphen testified that his review showed that AIW had six or seven truckloads of steel ready to ship. The November 16, 2012, replevin order in the replevin action attached part of the steel inspection report that was generated after the inspection. On November 20, 2012, in the presence of the East Hazel Crest Polic Department, Contegra broke AIW's lock on its gate and started taking the steel from its

property, which included steel that was not listed on the replevin order. On this same day, Contegra terminated AIW, and AIW filed a petition for bankruptcy.

¶ 46 Sutphen testified that AIW filed for bankruptcy because it knew it was "going to have to get some sort of short-term loan or something and get it quickly because we poured a lot of money into the steel in the last month or two without getting paid in anticipation of getting paid." He testified that "[a]ll these emails and agreed order to pay and all these things were indicating to me that they were going to pay, and so we kept working, and it drained down our money to about *** $80,000." Contegra returned to AIW's premises two more times to remove steel, and obtained all the steel AIW was originally going to ship to Contegra. According to Sutphen, as of November 20, 2012, AIW's shipping piece status report, shipping tickets, and photographs supported the conclusion that 100% of the first floor, 99% of the second floor, and about 75% of the penthouse and roof was fabricated but not necessarily shipped.

¶ 47 After filing for bankruptcy, AIW could not reorganize or obtain financing. It moved out of its facility where it had been for 50 years and ceased doing business. AIW tried to save the smaller equipment that could fit into storage containers at a storage facility. Because AIW could not get financing, the storage facility eventually "sold [the contents of the storage containers] or auctioned it off" due to unpaid rent. Based on Sutphen's experience, it was his opinion that the value of the equipment it lost due to shutting down was $2,613,222.50, and the value of the steel it lost from its inventory was $267,533. AIW also incurred $30,000 to move the equipment off its premises. Had AIW known that on September 7, 2012, Contegra was contemplating hiring another fabricator, Sutphen would have stopped working "so that we would not have gone through" or spent "several hundred thousand dollars" on its working capital on this project. It would have used it towards other incoming projects, as this was at the time when AIW was working on fabricating

the most complex connections for the project and was "pouring a lot of labor, man hours, and dollars into that." If AIW had saved its working capital, it could have remained open. Sutphen testified that AIW was prequalified with the CDB, had done some projects with them before, and was likely to do more with them in the future.

¶ 48    Sutphen testified that Barnard's statements to the CDB that Sutphen "provided a tremendous amount of false testimony to confuse the issue at hand" and that AIW had "severely overbilled and not delivering what we already bought" were not true.

¶ 49    Angela Ridgeway, Contegra's project manager, testified that she oversaw the construction schedule for the project. Ridgeway talked to AIW many times about the importance of the schedule, and AIW failed to stay on schedule. AIW delivered miscellaneous pieces of steel for different floors, but Contegra could not start construction or erection of the first floor without having all of the columns.

¶ 50    Contegra's last payment to AIW was on August 8, 2012, which covered AIW's invoices through June 22, 2012. Contegra stopped paying AIW because it "realized that we didn't have most of our steel on the job site, so we felt like AIW was grossly overpaid at this point." Contegra wanted to "see the actual material on the job site." She testified that Contegra "had paid for so much of the steel, and *** had very little percentage on the job site. And so we wanted to see some of the product that we had paid for. We felt like we overpaid at this point."

¶ 51    Ridgeway testified that Contegra asked for the steel "many times" and she testified about a spreadsheet she created that showed AIW's pay applications, how much Contegra paid, and how much steel was delivered to the job site. On August 28, 2012, Ridgeway requested Sutphen to provide "as soon as possible" the "delivery dates for the first floor steel." Asked whether after August 28, 2012, Contegra had sent AIW a "flurry" of emails asking for the steel to be shipped,

she testified "I'm sure there was," and then she identified emails dated August 30, 2012, September 28, 2012, October 3, 2012, October 4, 2012, October 5, 2012, and October 8, 2012, in which Contegra asked for either the steel to be shipped or for a status on shipment. Ridgeway testified that AIW made a shipment of steel in both September and October, and in early September AIW provided Contegra with a rough estimate on a schedule of delivery dates. Ridgeway acknowledged that on August 29, 2012, she told the CDB that "[t]he fabricator has all questions answered at this time and is in the process of fabrication" and that "[o]nce the steel is fabricated, we will need to discuss the delay and cost approved." Contegra instituted the replevin action because it felt like it had "grossly overpaid for steel that we were not receiving" and "at that point we couldn't even start construction of the building."

¶ 52    The total amount of structural steel for the project was 550 tons. At the time Contegra terminated AIW, 28% of the structural steel, or 154.9 tons of fabricated steel, had been delivered to the job site, and Contegra had paid for 66.57% for the structural steel. After Contegra removed steel from AIW's yard during the replevin action, Contegra had 51.25% of the structural steel, which was not sufficient to build the first floor. Contegra hired Affton, who was AIW's competitor, to keep the job moving, and Affton "had to do a lot of work," including work on the drawings and fabrication on the missing steel, and Contegra paid Affton a total of $950,994.76.

¶ 53    Jeffrey Altshul, an attorney and expert in issues related to financing statements and replevins, testified about the requirements for filing a UCC-1. In Altshul's review, he did not see any materials to support Contegra's assertion in its replevin complaint that Contegra had a properly perfected security interest as a result of filing a UCC-1 with the Illinois Secretary of State on February 6, 2012.

¶ 54    Brian Massimino, who represented AIW in the replevin action, testified that before the parties entered the agreed order in the replevin action, they tried to resolve the case and engaged in numerous discussions. On November 12, 2012, he wrote a letter to Contegra's attorney informing him that AIW was still expecting payment under the contract, that AIW would continue working, and that AIW was considering filing for bankruptcy, as it "was being forced to comply with the contract but not get paid at the same time." After the court entered the November 16, 2012, replevin order, Massimino informed the Cook County Sheriff's Office as well as Contegra's attorney that AIW was contemplating filing either a counter-replevin bond or bankruptcy, both of which would stay the proceedings. On November 20, 2012, the date Contegra started to replevy the steel, AIW filed for bankruptcy because it did not have funds, and the filing immediately stopped enforcement of the replevin order. He testified that Contegra's assertion in the replevin complaint that Contegra had a properly perfected security interest in the materials as result of the UCC-1 was false.

¶ 55    William Factor, AIW's attorney in the bankruptcy proceeding, testified that he filed AIW's emergency petition for bankruptcy to stop Contegra from taking steel from its yard. The bankruptcy case was ultimately dismissed because AIW was unable to obtain financing needed to implement a reorganization plan. AIW's bankruptcy filing was related to its job with Contegra.

¶ 56    Other expert testimony was elicited regarding the architect's drawings and the impact the UCC-1 had on AIW.

¶ 57    Kevin Connelly, the first assistant Chief Deputy for the Cook County Sheriff's Office who managed the levy and replevin unit, testified that, on November 20, 2012, the Cook County Sheriff's Office, did not execute a replevin order on AIW's premises nor did it authorize the East Hazel Crest Police Department to act in its place.

¶ 58    The parties entered into a stipulation that the UCC-1 filed against AIW was terminated on February 28, 2013.

¶ 59                            Verdict and Posttrial Motion

¶ 60    The jury found in favor of AIW on all claims except its claim for violation of trade secrets. It awarded damages as follows: $839,764 for breach of contract, which included $488,235 of unpaid invoices and $351,529 in interest; $75,000 for trespass; $65,000 for wrongful replevin; $150,000 for defamation; and $2,205 for slander of title. The jury also awarded $1,216,548 for fraud, which included $161,548 for the unbilled attorney's fees in AIW's bankruptcy, $30,000 for the cost of shutting down, $1 million for the value of lost equipment, and $25,000 for the value of lost inventory. The jury also awarded $5 million in punitive damages. The court entered judgment on the verdict for these amounts, and it subsequently denied Contegra's joint motion for judgment notwithstanding the verdict, for a new trial, or for remittitur

¶ 61                       AIW's Motion for Attorney Fees and Costs

¶ 62    The trial court granted in part and denied in part AIW's motion for attorney fees and costs and awarded AIW $379,836.60 in attorney's fees and $337 in court costs.

¶ 63                                 II. ANALYSIS

¶ 64                               Collateral Attack

¶ 65    Contegra contends that the trial court erred when it rejected Contegra's affirmative defense of an impermissible collateral attack. Contegra argues that AIW's claims for wrongful replevin, trespass, fraud, defamation, and slander of title are an impermissible collateral attack on the orders entered in the replevin action, as AIW's claims sought to collaterally overturn those orders. Contegra asserts that AIW never challenged the orders in the replevin action either before the trial

court or on appeal, and AIW never argued that the court in the replevin action did not have jurisdiction.

¶ 66    Initially, we note that AIW argues that Contegra waived its argument that the trial court erred in rejecting its collateral attack affirmative defense because Contegra did not raise this challenge in its posttrial motion.

¶ 67    Generally, the "[f]ailure to raise objection at trial or during post-trial proceedings results in waiver of the right to raise the issue on appeal." *Limanowski v. Ashland Oil Co.*, 275 Ill. App. 3d 115, 118 (1995). In addition, "when a case proceeds to trial after a motion for summary judgment is denied, the order denying the motion for summary judgment merges with the judgment entered and is not appealable." *Young v. Alden Gardens of Waterford, LLC*, 2015 IL App (1st) 131887, ¶ 42. However, "[a]n exception exists where the issue raised in the summary judgment motion presents a question of law and, therefore, would not be decided by the jury." *Id.*

¶ 68    Here, Contegra raised the collateral attack defense in its affirmative defenses, and in its motion for summary judgment, it argued that AIW waived any challenges to the orders entered in the replevin action for failing to appeal those orders. The trial court granted AIW's motion to strike Contegra's affirmative defenses, and it denied Contegra's motion for summary judgment on that issue. The question of whether the collateral attack doctrine barred AIW's claims was a question of law that was not presented to or decided by the jury. See *Wartalski v. JSB Construction & Consulting Co.*, 384 Ill. App. 3d 139, 144 (2008) ("No postjudgment motion is required to preserve matters determined without a jury for review on appeal."). Contegra did not forfeit its argument that the collateral attack doctrine barred AIW's claims when it failed to include the issue in its posttrial motion.

¶ 69    Our review of a trial court's order dismissing a defendant's affirmative defense as well as its order granting or denying a motion for summary judgment is *de novo. CitiMortgage, Inc. v. Bukowski*, 2015 IL App (1st) 140780, ¶ 15; *Gaston v. Founders Ins. Co.,* 365 Ill. App. 3d 303, 314 (2006).

¶ 70    Turning to the collateral attack doctrine, " '[a] collateral attack on a judgment is an attempt to impeach that judgment in an action other than that in which it was rendered.' " *Thomas v. Sklodowski*, 303 Ill. App. 3d 1028, 1033 (1999) (quoting *Buford v. Chief, Park District Police,* 18 Ill. 2d 265, 271 (1960)). Under this doctrine, "a final judgment rendered by a court of competent jurisdiction may only be challenged through direct appeal or procedure allowed by statute and remains binding on the parties until it is reversed through such a proceeding." *Fakhoury v. Pappas*, 395 Ill. App. 3d 302, 313 (2009).

¶ 71    Section 19-101 of the Code of Civil Procedure (Code) addresses actions in replevin and provides that, "[w]henever any goods or chattels have been wrongfully distrained, or otherwise wrongfully taken or are wrongfully detained, an action of replevin may be brought for the recovery of such goods or chattels, by the owner or person entitled to their possession." 735 ILCS 5/19-101 (West 2012). "[T]he purpose of the replevin statute is to test the right to possess personal property and place the successful party in possession." *Carroll v. Curry*, 392 Ill. App. 3d 511, 520 (2009).

¶ 72    In a replevin action, the court first holds a preliminary hearing. *Jim's Furniture Mart, Inc. v. Harris*, 42 Ill. App. 3d 488, 489 (1976). Under section 19-107 of the Code, "[i]f the plaintiff establishes a prima facie case to a superior right to possession of the disputed property, and if the plaintiff also demonstrates to the court the probability that the plaintiff will ultimately prevail on the underlying claim to possession," the court will enter a replevin order. 735 ILCS 5/19-107 (West 2012). The plaintiff must post a replevin bond before the sheriff can execute the replevin order,

and the sheriff will execute the order "unless the defendant posts a forthcoming bond in the same amount as the plaintiff." *Jim's Furniture Mart, Inc.,* 42 Ill. App. 3d at 489. Thereafter, the court "holds a trial on the merits of the claim and enters a final judgment." *Id.* "If a plaintiff does not repossess the goods until after judgment, the necessity for a bond is not as great because the plaintiff has prosecuted the suit and the trial court has made a final determination of the claim." *Id.* at 490.

¶ 73    As for the replevin bond, section 19-112 of the Code (735 ILCS 5/19-112) (West 2012)) provides that the replevin bond is "conditioned that [the plaintiff] will prosecute such action to effect and without delay and make return of the property to the defendant if return of the property shall be awarded, *** and save and keep harmless such sheriff or other officer." See *id.* at 490. Further, section 19-127 of the Code, which addresses actions on the bond, provides that, [i]f at any time the conditions of the bond *** are broken, *** the defendant *** may proceed and maintain an action on such bond for the recovery of all damages and costs, as have been sustained in consequence of the breach of such condition." 735 ILCS 5/19-127 (West 2012).

¶ 74    Accordingly, "the conditions of a replevin bond require the plaintiff (1) to prosecute the suit to effect and without delay; and (2) to make a return of the property if return is awarded; these are distinct and separate conditions, and a condition is broken and *the bond is forfeited by a failure in either condition.*" (Emphasis in original.) *Azar v. Statewide Insurance Co.*, 288 Ill. App. 3d 956, 960-61 (1997). "Thus, a breach of the replevin bond may occur where the plaintiff suffers an involuntary nonsuit, dismissal, or discontinuance of the action." *Id.* at 961. Further, "[i]t is well settled then that the objective of a statutory replevin bond is not merely to indemnify the sheriff, but it is also to furnish an additional remedy to the defendant in case the plaintiff fails to maintain and prosecute his suit to effect." *Id.* Therefore, "a defendant in a replevin suit may have a

subsequent cause of action on the bond to recover damages suffered as the result of the replevin suit where the plaintiff fails to prosecute the suit to effect and without delay." *Id.* Further, "[i]t is quite foreseeable that a defendant may suffer damages where the plaintiff fails to appear and defend his own action after he has obtained the replevied property" and "[a] defendant from whom the property was replevied will have no remedy if he is in fact injured when the plaintiff walks away from his own replevin suit and the court does not order a return of the property." *Id.* at 961-62.

¶ 75    Initially, we note that AIW asserted claims for wrongful replevin against Contegra and for recovery under the replevin bond against Travelers. The parties entered a stipulation before trial that provided in part that "as to Count XII of the First Amended Complaint, the claim for recovery under the replevin bond issued by [Travelers]" the parties agree that the "the issue as to Travelers is whether Contegra did, or did not, have the right to claim ownership of the steel listed on the replevin orders" and "the issue of ownership to the listed steel will be tried under the general rubric of 'wrongful replevin' *** ."

¶ 76    The court's November 16, 2012, order, was a preliminary order in the replevin action, as it determined that Contegra had "established a prima facie case to a superior right to possession of certain materials it purchased for fabrication and delivery by [AIW]" and the "probability that [Contegra] will ultimately prevail on the underlying claim to possession." See 735 ILCS 5/19-107 (West 2012). Contegra then filed the replevin bond, after which it replevied steel from AIW's premises. The action was removed to the bankruptcy court, which subsequently entered an order that provided that Contegra's replevin claim in the removed adversary complaint was "dismissed with prejudice as to Debtor solely with respect to the granting of further relief pursuant" to that claim and "dismissed without prejudice and with reservation of rights to pursue and enforce all

relief previously granted by the State Court pursuant to Order entered by the State Court."

Thereafter, Contegra did not continue to prosecute its replevin claim in the state court to effect

without delay, so the court did not enter a final judgment. Accordingly, because there was no final

determination after a trial on the merits in the replevin action, Contegra breached the condition of

the bond that it prosecute the suit to effect and without delay. See *Azar*, 288 Ill. App. 3d at 960-

61. AIW could therefore proceed on a subsequent cause of action on the bond.

¶ 77 We note that Contegra correctly asserts that the collateral attack doctrine applies to both

final judgments as well as interlocutory orders. See *Lewis v. Blumenthal*, 395 Ill. 588, 593-94

(1947). However, as previously discussed, here, the court in the replevin action entered the initial

order in a replevin action, and "a defendant in a replevin suit may have a subsequent cause of

action on the bond to recover damages suffered as the result of the replevin suit where the plaintiff

fails to prosecute the suit to effect and without delay." *Azar*, 288 Ill. App. 3d at 961; see 735 ILCS

5/19-127 (West 2012) ("If at any time the conditions of the bond *** are broken, *** the defendant

*** may proceed and maintain an action on such bond for the recovery of all damages and costs,

as have been sustained in consequence of the breach of such condition"); *Gilbert v. Sprague*, 196

Ill. 444, 453 (1902) (concluding that where the merits were not tried in the replevin action, a party

has a right to assert their right to title to the property in an action on the replevin bond).

¶ 78 Contegra asserts that the replevin statute does not contain any provisions that provide that

a defendant "who was unsuccessful in a *prima facie* replevin case to 'continue' a replevin case to

trial, or to maintain an action for bond in a separate case." However, as previously discussed, the

court's order in the replevin action in which the court determined that Contegra established a *prima*

*facie* case to a superior right to possession was not a final determination regarding the parties'

ownership of the property after a trial on the merits in the replevin action, and AIW could therefore proceed on the action on the replevin bond. See *id.*

¶ 79                                  *Res Judicata* and Collateral Estoppel

¶ 80    Contegra argues that AIW's wrongful replevin and trespass counts are barred by *res judicata* and collateral estoppel and that the trial court erred when it rejected its affirmative defenses based on these doctrines. Contegra asserts that the claims involve the same parties and issues and there was a final adjudication on the merits in the replevin case.

¶ 81    Our review of a trial court's order dismissing a defendant's affirmative defense is *de novo*. *CitiMortgage*, 2015 IL App (1st) 140780, ¶ 15. "A prior judgment may have preclusive effects in a subsequent action under both *res judicata* and collateral estoppel." *Nowak v. St. Rita High School*, 197 Ill. 2d 381, 389 (2001). Under the doctrine of *res judicata* "a final judgment on the merits rendered by a court of competent jurisdiction bars any subsequent actions between the same parties or their privies on the same cause of action." *Rein v. David A. Noyes & Co.*, 172 Ill. 2d 325, 334 (1996). For *res judicata* to apply, the following three elements must be established: "(1) there was a final judgment on the merits rendered by a court of competent jurisdiction, (2) there is an identity of cause of action, and (3) there is an identity of parties or their privies." *Nowak*, 197 Ill. 2d at 390.

¶ 82    Collateral estoppel "applies when a party *** participates in two separate and consecutive cases arising on different causes of action and some controlling fact or question material to the determination of both causes has been adjudicated against that party in the former suit by a court of competent jurisdiction." *Nowak*, 197 Ill. 2d at 389-90. Three requirements must be met for the collateral estoppel doctrine to apply: "(1) the issue decided in the prior adjudication is *identical* with the one presented in the suit in question, (2) there was a final judgment on the merits in the

prior adjudication, and (3) the party against whom estoppel is asserted was a party or in privity with a party to the prior adjudication." (Emphasis in original.) *Id.*

¶ 83 A judgment is considered final if it "fixes absolutely and finally the rights of the parties in the lawsuit; it determines the litigation on the merits so that, if affirmed, the only thing remaining is to proceed with the execution of the judgment." *In re Rogan M.*, 2014 IL App (1st) 132765, ¶ 9. To determine whether a "judgment or order is final, one should look to its substance rather than its form." *Richter v. Prairie Farms Dairy, Inc.*, 2016 IL 119518, ¶ 24. When a court dismisses a claim " 'without prejudice,' " it "signals that there was no final decision on the merits and that the plaintiff is not barred from refiling the action." *Id.*

¶ 84 Here, the doctrines of *res judicata* and collateral estoppel do not bar AIW's claims because there was no final judgment on the merits entered in the replevin action. As previously discussed, the court in the replevin action issued the November 16, 2012, initial order in which it found that Contegra established "a prima facie case to a superior right to possession of certain materials it purchased for fabrication and delivery by [AIW]" and "the probability that [Contegra] will ultimately prevail on the underlying claim to possession." The court subsequently entered orders modifying that order, but it never entered a final judgment after a trial on the merits.

¶ 85 Contegra asserts that the bankruptcy court's April 19, 2023, order, which dismissed the replevin claim contained in Contegra's removed replevin action, was a final judgment because the court dismissed the replevin claim with prejudice and effectively terminated the litigation as to the replevied materials.

¶ 86 Initially we note that, in Contegra's motion to consolidate the removed state court replevin action with Contegra's original adversary complaint filed in the bankruptcy court, it requested the bankruptcy court dismiss the replevin of steel claim contained in the removed state court action as

"moot." When a cause of action is dismissed as moot, there was no judgment on the merits. *Gassman v. Clerk of the Circuit Court of Cook County*, 2017 IL App (1st) 151738, ¶ 33 ("A mootness finding is not a judgment on the merits and will not support a finding of *res judicata* in a future case"); *Johnson v. Du Page Airport Authority*, 268 Ill. App. 3d 409, 419 (1994). In Contegra's reply brief on appeal, it asserts that it "requested the dismissal of the replevin count as 'moot' because the rights of the parties were conclusively decided by the Replevin Orders—not because AIW had asserted various claims against Contegra in [the original adversary]." However, as previously discussed, the court in the replevin action did not make a final determination, or conclusively decide, the issue of the parties' rights to possession of the materials.

¶ 87    Further, in the bankruptcy court's April 19, 2023, order, it dismissed Contegra's replevin claim contained in the removed state court action "with prejudice as to Debtor solely with respect to the granting of further relief pursuant" to that claim but dismissed it "without prejudice and with reservation of rights to pursue and enforce all relief previously granted by the State Court pursuant to Order entered by the State Court." Accordingly, in the bankruptcy court's order, it dismissed Contegra's replevin claim as to further relief in the bankruptcy court, but it did not terminate the litigation on Contegra's replevin claim as to the parties pursuing and enforcing all relief previously granted by the state court. The bankruptcy court's order therefore was not a final judgment on the merits on Contegra's replevin claim, and Contegra could have pursued further relief in the state court replevin action. Because Contegra has not established there was a final judgment on the merits entered by a previous court of competent jurisdiction, it has failed to show that *res judicata* and collateral estoppel bar AIW's claims for wrongful replevin and trespass.

¶ 88    We note that Contegra also asserts that AIW's claims for fraud, defamation, and slander of title necessary fail because any issues related to the replevin case were conclusively decided in

Contegra's favor. However, as previously discussed, the court in the replevin action did not conclusively decide or make a final determination on the issue of possession of the materials. AIW's claims for fraud, defamation, and slander of title are likewise not barred by the doctrines of *res judicata* and collateral estoppel.

¶ 89                                                  Fraud

¶ 90    Contegra contends that the court erred when it denied its motion for judgment notwithstanding the verdict on AIW's fraud claim. Contegra argues that AIW's "settlement theory," which claimed that Contegra falsely promised that it wanted to settle the parties' payment dispute in the replevin case when it did not intend to pay AIW and that Contegra made false settlement promises to induce AIW into allowing its competitor access to its yard, is based on broken promises and unfulfilled obligations that are not actionable under the promissory fraud doctrine. Contegra argues that AIW did not prove that it engaged in a scheme to defraud, which is an exception to promissory fraud.

¶ 91    "A judgment notwithstanding the verdict is to be entered only when all the evidence, viewed in the light most favorable to the nonmovant, so overwhelmingly favors the movant that no contrary verdict could stand based on the evidence." *Northern Trust Co. v. University of Chicago Hospitals & Clinics*, 355 Ill. App. 3d 230, 241 (2004). In considering the motion, the "trial court may not reweigh the evidence and set aside the verdict simply because a jury could have drawn different conclusions or inferences from the evidence or because it feels other possible results may have been far more reasonable." *Id*. A trial court may not "enter a judgment notwithstanding the verdict if there is any evidence showing a substantial factual dispute or where the assessment of the witnesses' credibility or the determination regarding conflicting evidence is

decisive to the outcome of the trial." *Dunning v. Dynegy Midwest Generation, Inc.*, 2015 IL App (5th) 140168, ¶ 17.

¶ 92    As a reviewing court, when we review a trial court's denial of a motion for a judgment notwithstanding the verdict, "we do not weigh the evidence or assess the credibility of the witnesses," and we "may only consider the evidence and any inferences therefrom in a light most favorable to the nonmovant." *Great American Insurance Co. of New York v. Heneghan Wrecking & Excavating Co.*, 2015 IL App (1st) 133376, ¶ 52. We will not substitute our judgment for the jury's or reweigh the evidence. *Buckholtz v. MacNeal Hospital*, 337 Ill. App. 3d 163, 167-68 (2003). We review a trial court's ruling on a motion for judgment notwithstanding the verdict *de novo*. *Wilcox v. Advocate Condell Medical Center*, 2024 IL App (1st) 230355, ¶ 38.

¶ 93    To prove a fraud claim, a plaintiff must prove that (1) a defendant made "a false statement of material fact"; (2) the defendant knew the statement was false; (3) the defendant intended "that the statement induce the plaintiff to act"; (4) the plaintiff "relied upon the truth of the statement"; and (5) the plaintiff suffered damages as a result of the relying on the statement. *Connick v. Suzuki Motor Co. Ltd.,* 174 Ill.2d 482, 496 (1996). "Fraud may be perpetrated by fraudulent misrepresentation or by fraudulent concealment." *Chatham Surgicore, Ltd. v. Health Care Services Corp.*, 356 Ill. App. 3d 795, 803 (2005).

¶ 94    As for fraudulent misrepresentation, generally, a statement of future intent cannot be the basis of a fraud claim because "alleged misrepresentations must be statements of present or preexisting facts, and not statements of future intent or conduct." *Bradley Real Estate Trust v. Dolan Associates Ltd.*, 266 Ill. App. 3d 709, 713 (1994). Under the promissory fraud doctrine, "a plaintiff cannot maintain a fraud action based on a fraudulent promise to perform a future act." *Gagnon v. Schickel*, 2012 IL App (1st) 120645, ¶ 32. However, there is an exception to promissory

fraud where "promises are actionable if the false promise or representation of future conduct is alleged to be the scheme employed to accomplish the fraud." *Ault v. C.C. Services, Inc.*, 232 Ill. App. 3d 269, 272 (1992). Thus, "promissory fraud, based on future acts, is not actionable in Illinois unless the promise is a part of a 'scheme' to defraud." *General Electric Credit Auto Lease, Inc. v. Jankuski*, 177 Ill. App. 3d 380, 384 (1988) (quoting *Steinberg v. Chicago Medical School*, 69 Ill. 2d 320, 334 (1977)).

¶ 95     Initially, we note that Contegra asserts that the court never instructed the jury on a scheme to defraud. For AIW's fraud claim, the court instructed the jury that AIW claimed that Contegra made the following statements:

> "That it would pay for steel that Advance Iron Works was entitled to be paid for in late October 2012, that they were interested in settling the dispute in late October 2012, and that they would pay Advance Iron Works $221,654.40 by wire transfer by November 6, 2012 if it was reasonably satisfied with its November 5, 2012 inspection of Advance Iron Works' premises."

As for fraudulent concealment, which we address below, the court instructed the jury that AIW claimed that Contegra "knowingly concealed" from AIW the fact that "as early as September 2012 that it intended to replace [AIW] with another fabricator." Contegra asserts that the trial court did not instruct the jury on a "scheme" and AIW did not prove that one existed. To the extent that Contegra argues that the court erred because it did not instruct the jury on a scheme to defraud, that argument is forfeited because Contegra did not raise this issue in its posttrial motion. See *People v. Miller,* 2021 IL App (1st) 190060, ¶ 42 ("To preserve a jury instruction error for review on appeal, a party must (1) object to a proposed instruction or tender one of his own and (2) raise

the issue again in a posttrial motion."). Contegra also does not argue on appeal that it properly preserved for review any argument on the issue.

¶ 96    Turning to whether the trial court properly denied Contegra's motion for judgment notwithstanding the verdict, the evidence, viewed in the light most favorable to AIW and taking all reasonable inferences in favor of AIW, did not so overwhelmingly favor Contegra that no contrary verdict could stand based on the evidence. The evidence was sufficient to support a finding that Contegra made false representations as part of a scheme to defraud.

¶ 97    The jury heard extensive evidence about AIW's invoices, Contegra's payments, the change orders, AIW's shipments of fabricated steel, the parties' communications, Contegra's communications to the CDB, the inspection of AIW's premises and report generated after it, and the UCC-1 filed against AIW. From the evidence presented at trial, the jury could conclude that Contegra, as part of a scheme to defraud, falsely misrepresented to AIW that it was interested in settling the dispute and would pay AIW if it was reasonably satisfied with the inspection to induce AIW to continue fabricating and shipping the steel for the project without being paid and to induce AIW to agree to the inspection of its premises, at which Contegra brought its new fabricator to generate a report of the inspection.

¶ 98    Based on this evidence, the jury could also conclude that Contegra knew its representations were false. The evidence showed that at the time Contegra made the representations that it was interested in resolving the dispute and would pay AIW if reasonably satisfied with the inspection, it had already arranged for a new fabricator, who came to the inspection for Contegra, to take over the job, from which the jury could reasonably infer that Contegra had already replaced AIW as the fabricator and had no intent to resolve the dispute or pay AIW after the inspection even if it was reasonably satisfied with the inspection.

¶ 99 Contegra asserts that there was no evidence that AIW relied on its alleged promise to pay when AIW continued fabricating steel or when AIW allowed Contegra to inspect its premises because AIW was already obligated under the contract to do both. The evidence was sufficient for the jury to reasonably conclude that AIW relied on Contegra's misrepresentations. AIW presented evidence that it had been fabricating and shipping steel in September and October without receiving a payment since early August and that under the parties' contract, AIW had the right to stop all work if it did not receive payments when due. AIW nevertheless continued fabricating and agreed to Contegra's representatives conducting an inspection of its premises, thus supporting the inference that it relied on Contegra's representations that Contegra would pay AIW.

¶ 100 Viewing the evidence in the light most favorable to AIW and taking all reasonable inferences in its favor, the evidence was sufficient to support that Contegra made false representations as part of a scheme to defraud. The evidence does not overwhelmingly favor Contegra such that no contrary verdict could stand based on the evidence.

¶ 101                                    Fraudulent Concealment

¶ 102 Contegra contends that AIW's "fraudulent concealment" theory, which was based on AIW's claim that Contegra knowingly concealed its intent to terminate the contract and hire another fabricator, is insufficient because Contegra did not have a duty to disclose its alleged intent to replace AIW. Contegra argues that AIW never alleged or proved that it had a fiduciary or confidential relationship with Contegra, that it placed trust and confidence in Contegra, or that Contegra was in a position of overwhelming influence and superiority over it.

¶ 103 To establish fraudulent concealment, a plaintiff must show, that "the defendant concealed a material fact when it was under a duty to disclose to the plaintiff." *W.W. Vincent & Co. v. First Colony Life Insurance Co.*, 351 Ill. App. 3d 752, 762 (2004). There are several circumstances

under which a duty to disclose may arise, including "if the plaintiff and the defendant are in a fiduciary or confidential relationship," or "where plaintiff places trust and confidence in defendant, thereby placing defendant in a position of influence and superiority over plaintiff." *Connick*, 174 Ill. 2d at 500. A party may also "assume a duty to disclose information accurately by its conduct." *Union National Bank & Trust Co. of Joliet v. Carlstrom*, 134 Ill. App. 3d 985, 989 (1985); *Schrager v. North Community Bank*, 328 Ill. App. 3d 696, 707 (2002).

¶ 104   In addition, "[t]he mere fact that the parties have engaged in business transactions or have a contractual relationship is not itself sufficient to establish a fiduciary relationship." *Benson v. Stafford*, 407 Ill. App. 3d 902, 913 (2010). Further, "[m]ere silence in a business transaction does not amount to fraud." *Heider v. Leewards Creative Crafts, Inc.*, 245 Ill. App. 3d 258, 269 (1993). However, "[t]he concealment of a material fact during a business transaction is actionable if 'done with the intention to deceive under circumstances creating an opportunity and duty to speak.' " (citations omitted) *W.W. Vincent & Co.*, 351 Ill. App. 3d at 762. Further, "mere silence is quite different from concealment" and "[s]ilence accompanied by deceptive conduct or suppression of material facts results in *active concealment* and it then becomes the duty of a person to speak." (Emphasis in original.) *Mitchell v. Skubiak*, 248 Ill. App. 3d 1000, 1005 (1993).

¶ 105   Here, AIW set forth sufficient evidence for the jury to conclude that Contegra's conduct created a duty to disclose. The jury could reasonably infer that Contegra's silence was accompanied by deceptive conduct, resulting in an act of concealment and a duty to disclose. The evidence showed that as of September 7, 2012, Contegra wanted to replace AIW as the fabricator. In an email to the CDB that day, Barnard stated that it "had not been able to find an AISC fabricator that wants to get involved with this project." Thereafter, Contegra continued to demand steel from AIW without making any payments after August 8, 2012, which covered invoices from June 2012.

The jury also heard evidence that even though Contegra's last payment was in August 2012 and Contegra had been actively looking to replace AIW in September 2012, AIW continued to fabricate and ship steel, as Sutphen testified that at this time AIW was fabricating the "most complex" connections and "pouring a lot of labor, man hours, and dollars into that" and that as October 8, 2012, AIW had been fabricating on the moment connections for about one and a half months and was shipping the steel when completed. Ridgeway testified that AIW shipped steel in September and October.

¶ 106    Further, the evidence showed that when Contegra told AIW it was interested in salvaging the relationship, it had already arranged for a new fabricator. On October 25, 2012, Contegra informed the CDB that it had "arranged for another fabricator to take over the remainder of the fabrication." Then, a few days later, on October 29, 2012, Contegra did not disclose this information to AIW, but instead informed AIW that it remained "interested in discussing further if there's a possibility to meet amicably to discuss any opportunity of salvaging somewhat the relationship between AIW and Contegra." Thereafter, when AIW agreed to the inspection of its yard under the November 2, 2012, agreed order in exchange for payment if Contegra was reasonably satisfied, AIW did not know that Contegra had already arranged for a new fabricator to take over, or that the inspection of its premises was going to be performed by its competitor and replacement, Affton, who also generated the inspection report.

¶ 107    Contegra asserts that AIW failed to show that it detrimentally relied on Contegra's decision to replace AIW. The evidence showed that AIW continued to fabricate and ship the steel in September and October even though the last payment it received was in early August 2012, and the contract provided that AIW had the right to stop all work if it did not receive payments when due. The jury also heard Sutphen testify that, had AIW known that on September 7, 2012, Contegra

was contemplating hiring another fabricator, AIW would not have spent "several hundred thousand dollars" of working capital on this project and would have worked on other incoming projects.

¶ 108 Viewing the evidence in the light most favorable to AIW and taking all reasonable inferences in its favor, the evidence was sufficient for the jury to conclude that Contegra's silence regarding its intention to replace AIW with another fabricator resulted in an act of concealment such that Contegra had a duty to disclose this fact, and that AIW detrimentally relied on Contegra's concealment.

¶ 109                             Jury's Award of Damages for Fraud Claim

¶ 110 Contegra contends that the jury's award of damages for the fraud claim, which included bankruptcy fees, shutdown costs, lost equipment, and the value of lost inventory, are not recoverable under a fraud theory. It argues that recovery in a business dispute is limited to the amount needed to compensate for the loss occasioned by the fraud, or the benefit-of-the bargain rule, and the jury's award for these losses falls outside of the fair and reasonable amount necessary to compensate AIW, as they were not reasonably foreseeable from the alleged misrepresentations related to the contract. Contegra asserts that the trial court erred in summarily concluding that the jury's award of damages proximately resulted from the alleged fraud.

¶ 111 "Damages for fraud are typically calculated using the benefit-of-the-bargain rule, where the plaintiff's recovery is limited to an amount needed to compensate for the loss occasioned by the fraud" (*Sheth v. SAB Tool Supply Co.*, 2013 IL App (1st) 110156, ¶ 90) "or the amount which plaintiff is actually out of pocket by reason of the transaction" *Brown v. Broadway Perryville Lumber Co.*, 156 Ill. App. 3d 16, 25 (1987). Further, the "damages may not be predicated on mere speculation, and must be a proximate, and not remote, consequence of the fraud." *Id.* "[T]he defrauded party is entitled to be placed in the same financial position as he would have been in

had the misrepresentation in fact been true." *Id.* Further, "proximate causation limits recovery to 'those damages which might foreseeably be expected to follow from the *character* of the misrepresentation itself.' " (Emphasis in original.) *Martin v. Heinold Commodities, Inc.*, 163 Ill. 2d 33, 61 (1994) (quoting W. Prosser, Torts § 110, at 732 (4th ed. 1971)).

¶ 112   Here, the jury awarded a total of $1,216,548, which included $161,548 for the unbilled attorney fees in AIW's bankruptcy case, $30,000 for shutdown costs, $1 million for lost equipment, and $25,000 for the value of lost inventory. The evidence shows that these damages were reasonably foreseeable and proximately caused by Contegra's conduct.

¶ 113   The jury heard evidence to support that, as a result of Contegra's conduct, AIW filed for bankruptcy, ceased operations, and moved out of its facility where it had been for 50 years. It also heard Sutphen testify about a list of 1,000 pieces of equipment at AIW's premises in July 2013, and that the value of its lost equipment as a result of shutting down was $2,613,222. Viewing the evidence in the light most favorable to AIW, the evidence was sufficient to support the jury's award of damages.

¶ 114   Accordingly, the trial court did not err when it denied Contegra's motion for judgment notwithstanding the verdict in AIW's favor on its fraud claim and the jury's award of damages.

¶ 115                          Trespass and Wrongful Replevin

¶ 116   Contegra continues to assert that the wrongful replevin and trespass claims are barred by the collateral attack and *res judicata* doctrines. However, as previously discussed, we have already determined that AIW's claims are not barred by these doctrines. Contegra also contends that we should reverse the jury's verdict in favor of AIW on the trespass claim because Contegra entered AIW's premises pursuant to the replevin orders, which were valid court orders.

¶ 117 "A defendant commits the tort of trespass by entering onto a plaintiff's land without permission, invitation, or other right." *Schweihs v. Chase Home Finance LLC*, 2021 IL App (1st) 191779, ¶ 30. Under section 19-109 of the Code, a replevin order "shall require the sheriff, or other officer to whom it is directed to take the property, describing it as in the complaint, from the possession of the defendant, and deliver the same to the plaintiff unless such defendant executes a bond and security as hereinafter provided,***." 735 ILCS 5/19-109 (West 2012).

¶ 118 Here, the November 16, 2012, replevin order entered by the court in the replevin action authorized the Cook County Sheriff's Office to take the materials from AIW's yard. It stated that the "Cook County Sheriff, shall, having received from Plaintiff *** a bond of sufficient surety *** take the Materials from the premises located at [AIW's premises] as well as any alternative site where the Materials and Show Drawings may be located." However, the East Hazel Crest Police Department, not the Cook County Sheriff's Office, was present when Contegra entered AIW's premises on November 20, 2012, pursuant to the replevin order. Accordingly, because the November 16, 2012, replevin order required the presence of the Cook County Sheriff's Office, Contegra did not properly enter AIW's premises pursuant to the court's November 16, 2012, order. Contegra has not cited any authority to support its argument it could properly enter AIW's property and execute a replevin order in the presence of different law enforcement authority than what the court required in its replevin order.

¶ 119 Contegra also asserts that the parties' contract expressly granted it the right to enter AIW's premises and " 'to inspect the items' " of steel that AIW was fabricating. "It is a defense to an action for trespass that the defendant's entry was permitted by the terms of a valid and lawful contract." *Schweihs*, 2021 IL App (1st) 191779, ¶ 30. However, on November 20, 2012, the day Contegra entered AIW's premises to replevy the steel, Contegra had already terminated AIW.

Further, AIW's trespass claim was not based on Contegra entering AIW's property to inspect steel under the contract but based on Contegra's action of unlawfully entering its premises without AIW's permission to remove the steel.

¶ 120   Contegra also asserts that AIW failed to prove actual damages resulting from its alleged trespass and did not provide evidence to justify the jury's award of $75,000. However, "a plaintiff need not prove actual harm to recover damages for trespass; trespass occurs whenever property interest is invaded." *Chicago Title Land Trust Co. v. JS II, LLC*, 2012 IL App (1st) 063420, ¶ 77. "In fact, 'every trespass entitles the plaintiff to at least nominal damages.' " *Id.* (quoting *Johnson v. Tipton,* 103 Ill. App. 3d 291, 296-97 (1982)). Here, the evidence showed that Contegra, without the presence of the Cook County Sheriff's Office as required by the replevin order, entered AIW's premises by breaking the lock on its gate, after which it started taking the steel from its property. Accordingly, the jury could reasonably conclude that Contegra invaded AIW's property interest such that AIW was entitled to nominal damages.

¶ 121   Contegra also claims that AIW failed to prove that it incurred actual damages from the wrongful replevin. The evidence was sufficient to support that AIW incurred damages from the wrongful replevin, as Sutphen testified about the amount and pieces of steel that Contegra took from its premises during the replevin process that were not listed in the replevin order.

¶ 122   Accordingly, the trial court did not err when it denied Contegra's motion for judgment notwithstanding the verdict in AIW's favor on its claims for trespass and wrongful replevin.

¶ 123                                      Defamation

¶ 124   Contegra contends that we should reverse the judgment in favor of AIW on its defamation claim because AIW failed to present any evidence that Contegra made a defamatory statement. Contegra argues that the court erred when it summarily denied Contegra's motion for summary

judgment based on its argument that the alleged defamatory statements were reasonably capable of an innocent construction and privileged statements of opinion.

¶ 125  AIW's defamation claim was based on statements that Contegra made to the CDB that AIW: (1) "submitted false information in order to overbill [Contegra] for work not performed"; (2) "severely overbilled"; and (3) "had provided a tremendous amount of false testimony in the replevin action."

¶ 126  To prove defamation, a plaintiff must establish: "(1) that the defendant made a false statement about the plaintiff; (2) that the defendant made an unprivileged publication of that statement to a third party; and (3) that the publication caused damages." *Goral v. Kulys*, 2014 IL App (1st) 133236, ¶ 41. A statement is considered "defamatory if it harms an individual's reputation by lowering the individual in the eyes of the community or if it deters the community from associating with the individual." *Doe ex rel. Doe v. Catholic Diocese of Rockford*, 2015 IL App (2d) 140618, ¶ 18.

¶ 127  A statement is considered "defamatory *per se* if the resulting harm is apparent and obvious on the face of the statement." *Stone v. Paddock Publications, Inc.*, 2011 IL App (1st) 093386, ¶ 25. There are five categories of statements considered to be defamatory *per se*, including, as relevant here, words that impute that a person: "is unable to perform or lacks integrity in performing her or his employment duties"; "lacks ability or otherwise prejudices that person in her or his profession"; and "has committed a crime." *Solaia Technology, LLC v. Specialty Publishing Co.*, 221 Ill. 2d 558, 579-80 (2006).

¶ 128  Under the innocent construction rule, even if a statement fits into one of the defamatory *per se* categories, it will not be actionable "if it is reasonably capable of an innocent construction." *Kolegas v. Heftel Broadcasting Corp.*, 154 Ill. 2d 1, 11 (1992). Under this rule, "a court must

consider the statement *in context* and give the words of the statement, and any implications arising from them, their natural and obvious meaning." (Emphasis in original.) *Green v. Rogers*, 234 Ill. 2d 478, 499 (2009). "[T]he context of the statement is critical in determining its meaning, as a given statement may convey entirely different meanings when presented in different contexts." *Id*. "Only *reasonable* innocent constructions will remove an allegedly defamatory statement from the *per se* category." (Emphasis in original.) *Kolegas*, 154 Ill. 2d at 11. Further, "we will not strain to find an innocent meaning for words when a defamatory construction is far more reasonable." *Tuite v. Corbitt*, 224 Ill. 2d 490, 515 (2006). " 'Whether a statement is reasonably susceptible to an innocent interpretation is a question of law for the court to decide.' " *Kapotas v. Better Government Ass'n,* 2015 IL App (1st) 140534, ¶ 58 (quoting *Bryson v. News America Publications, Inc.,* 174 Ill. 2d 77, 90 (1996)).

¶ 129   Contegra's statements that AIW provided false information in order to overbill Contegra and that AIW had severely overbilled are words that implied that AIW was "unable to perform or lack[ed] integrity in performing" its employment duties and that it lacked ability or otherwise prejudiced AIW in its profession. Contegra's statement to the CDB that AIW provided a tremendous amount of false testimony in the replevin action are words that imputed that AIW had committed a crime. See 720 ILCS 5/32-2 (West 2012).

¶ 130   Contegra asserts that the statements are subject to a reasonable innocent construction and that they merely reflect its dissatisfaction with AIW's performance under the contract. We disagree. Viewed in context and given their natural and obvious meaning, Contegra's statements cannot be reasonably understood as reflecting just mere expressions of dissatisfaction with AIW's performance under the contract. Rather, the statements assert that AIW lied in its business practices and billing with Contegra and that it provided false testimony in court. The statements imputed

that AIW lacked integrity in performing its employment or professional duties and that AIW committed a crime by providing false testimony before the court in the replevin action.

¶ 131   Contegra also asserts that the statements were non-actionable expressions of opinions about AIW's performance under the contract, AIW's conduct in the replevin case, and AIW's billing practices.

¶ 132   "[E]ven if a statement is defamatory *per se* and not subject to an innocent construction, the statement may enjoy constitutional protection under the first amendment if it is the expression of an opinion that does not state or imply an assertion of fact which is provably false." *Perfect Choice Exteriors, LLC v. Better Business Bureau of Central Illinois, Inc.*, 2018 IL App (3d) 150864, ¶ 23. "To determine whether an alleged defamatory statement is protected under the first amendment, or whether it can be reasonably interpreted as stating actual facts, the emphasis is on whether it contains an objectively verifiable assertion." *Jacobson v. Gimbel*, 2013 IL App (2d) 120478, ¶ 35.

¶ 133   We note that "[t]hese first amendment protections apply where the defamation claim is brought by a public official or a public figure, or where the claim is brought by a private individual against a media defendant." *Perfect Choice Exteriors, LLC,* 2018 IL App (3d) 150864, ¶ 24. "Our supreme court has yet to determine whether these constitutional protections also apply where, as here, a private party has allegedly defamed another private party on a matter of public or private concern." *Id.* However, the appellate court noted in *Perfect Choice Exteriors, LLC*, that "[i]n several published decisions, our appellate court has assumed, without deciding, that the first amendment privilege applies to statements made by a private defendant." *Id.* n.1.

¶ 134   Assuming the first amendment protection applies here, Contegra's statements that AIW provided false information in order to overbill for work it did not perform, that it severely overbilled Contegra, and that it provided a tremendous amount of false testimony before the

replevin court were assertions that could be objectively verified as true or false. See *Kumaran v. Brotman,* 247 Ill. App. 3d 216, 228 (1993) ("In determining whether a statement is one of fact or opinion, a court should consider the totality of the circumstances and whether the statement can be objectively verified as true or false."). The statements are therefore not expressions of opinions. Contegra asserts that the statements that AIW provided a "tremendous amount of false testimony" and that AIW "severely overbilled" contained amorphous, hyperbolic, and conclusory terms that are not fact-based or verifiable. However, "a false assertion of fact can be defamatory even when couched within apparent opinion or rhetorical hyperbole." *Solaia Technology, LLC.*, 221 Ill. 2d at 581.

¶ 135   Contegra also contends, in the alternative, that AIW failed to prove that Contegra made an unprivileged publication of the alleged defamatory statements. It asserts that AIW failed to overcome the qualified privilege doctrine because it failed to prove that Contegra made the statements to CDB in bad faith or that it abused the privilege.

¶ 136   The trial court determined that Contegra had a qualified privilege for the statements it made to the CDB. A defamatory statement may not be actionable if it is protected by a qualified privilege (*Kuwik v. Starmark Star Marketing and Administration, Inc.,* 156 Ill. 2d 16, 24 (1993)), which enhances a plaintiff's burden. *Dent v. Constellation NewEnergy, Inc.*, 2022 IL 126795, ¶ 30. "This privilege is based on the policy of protecting honest communications of misinformation in certain favored circumstances in order to facilitate the availability of correct information." *Id.*

¶ 137   However, a defendant may abuse a qualified privilege. *Kainrath v. Grider*, 2018 IL App (1st) 172270, ¶ 45. A plaintiff may prove that a defendant abused the privilege "by demonstrating a direct intent to injure another or a reckless disregard of the defamed party's rights and of the consequences that may result to her." *Cianci v. Pettibone Corp.,* 298 Ill. App. 3d 419, 426 (1998).

While the court decides the question of whether a qualified privilege exists, the jury decides the issue of whether the defendant abused the privilege, as it is a question of fact. *Kainrath*, 2018 IL App (1st) 172270, ¶ 45.

¶ 138 The trial court here instructed the jury to determine whether Contegra abused its qualified privilege. The jury found in favor of AIW on its defamation claim, so it necessarily found that Contegra abused the privilege. There was sufficient evidence to support the jury's finding. As previously discussed, Contegra's statements that AIW provided false information in order to overbill for work not performed, AIW severely overbilled, and AIW provided a tremendous amount of false testimony in the replevin action were made to the CDB, the owner of the project. The evidence showed that AIW had worked with the CDB before and was likely to do more projects with them in the future. The jury could reasonably conclude that Contegra's statements to the CDB implying that AIW engaged in false business and billing practices and provided false testimony before a court were intended to injure AIW by damaging its reputation with the CDB as well as with its other business relationships.

¶ 139 Contegra asserts that there was no evidence that it made the statements with actual knowledge of their falsity or with reckless disregard as to whether they were true or false, asserting that Contegra believed the statements were true. The jury heard the witnesses testify extensively about the terms of the contract, Contegra's payments, AIW's invoices, the amount of steel AIW fabricated and delivered for the project, and the costs and delay issues caused by the architect's drawings. It also heard the witnesses testify about Sutphen's testimony in the replevin action and the amount of steel required for the project. It was the jury's role to determine the credibility of the witnesses, and we will not reweigh the evidence. See *Great American Insurance Co. of New York*, 2015 IL App (1st) 133376, ¶ 52 ("In considering the denial of a motion for a judgment

notwithstanding the verdict, we do not weigh the evidence or assess the credibility of the witnesses."). The evidence, viewed in the light most favorable to AIW, was sufficient for the jury to reasonably conclude the Contegra made the statements that AIW severely overbilled, provided false information to overbill for work it did not perform, and provided false testimony in the replevin action, to the CDB with reckless disregard of the truth or falsity of the statements or of AIW's rights and the consequences that could result.

¶ 140   Contegra also argues that the jury's award of $150,000 for AIW's defamation claim is unsupported by the evidence. However, for a defamation *per se* claim, as here, a plaintiff "need not plead or prove actual damages to his reputation," as "statements that are defamatory *per se* 'are thought to be so obviously and materially harmful to the plaintiff that injury to [his] reputation may be presumed.' " *Seith v. Chicago Sun-Times, Inc.*, 371 Ill. App. 3d 124, 134 (2007) (quoting *Bryson,* 174 Ill. 2d at 87). Accordingly, the trial court did not err when it denied Contegra's motion for judgment notwithstanding the verdict in favor of AIW on the defamation claim.

¶ 141                               Slander of Title

¶ 142   Contegra contends that the trial court erred when it denied its motion for judgment notwithstanding the verdict in favor of AIW on the slander of title claim because AIW failed to prove that Contegra acted with malice when it filed the UCC-1.

¶ 143   To prove slander of title, a plaintiff must establish that "(1) that the defendant made a false and malicious publication, either oral or written; (2) that such publication disparages the plaintiff's title to property; and (3) damages due to such publication." *American National Bank & Trust Co. v. Bentley Builders, Inc.*, 308 Ill. App. 3d 246, 251 (1999). "The plaintiff must also show that the defendant acted with malice." *Id*. To prove malice, a plaintiff "must show that the defendant knew that the disparaging statements were false or that the statements were made with reckless disregard

of their truth or falsity." *Id.* at 252. A "defendant acts with reckless disregard if he publishes the allegedly damaging matter despite a high degree of awareness of its probable falsity or if the defendant has serious doubts as to its truth." *Id.* If a party has reasonable grounds to believe that it "has title or a claim to the property," it does not act with malice. *Id.* Whether a defendant acted with malice is a question of fact. *Id.*

¶ 144    Contegra contends that AIW did not prove that it acted with malice when it filed the UCC-1 on February 6, 2012, asserting that by February 2, 2012, it had paid AIW $283,574 but had not yet received any steel. Contegra argues therefore that it had every reason to believe it had a right to file a UCC-1. However, the jury also heard evidence that the parties entered the contract in December 2011, and that thereafter, on February 6, 2012, Contegra filed the UCC-1 that covered as collateral "all structural steel" as well as "steel decking, metal fabrications, metal stairs" located on AIW's premises. Barnard testified that at the time the UCC-1 was filed, he had no reason to believe that there was any fabricated steel at AIW's shop yet. He also testified that the parties did not have a loan agreement, AIW did not consent to the filing, and he did know whether the contract granted a security interest to Contegra. Further, the jury heard evidence regarding Contegra's payments and AIW's invoices, and it heard testimony that AIW did not know about the UCC-1 filed against it until September 2012, and that in October 2012, Contegra used it to support its position that it owned steel in AIW's yard.

¶ 145    The evidence was sufficient for the jury to conclude that Contegra filed the UCC-1 on February 6, 2012, that covered "all structural steel" in AIW's yard with reckless disregard for its truth and that it therefore acted with malice when it filed the statement. The trial court did not err when it denied Contegra's motion for judgment notwithstanding the verdict in favor of AIW on its slander of title claim.

¶ 146                                    Punitive Damages

¶ 147 Contegra contends that the trial court erred in denying its motion for judgment notwithstanding the verdict and its motion for remittitur of the jury's $5 million punitive damages award because AIW failed to prove that Contegra's conduct was willful, and the award was excessive.

¶ 148 Contegra asserts the jury's award of punitive damages violates Illinois law and is unconstitutional. Under the Illinois common law standard, "once the court has determined as a matter of law that punitive damages can be awarded for a particular cause of action, the jury must decide based on the evidence whether the defendant's conduct was sufficiently willful or wanton to warrant the imposition of punitive damages." *Baumrucker v. Express Cab Dispatch, Inc.*, 2017 IL App (1st) 161278, ¶ 73. We will reverse a jury's award "only if the award was 'so excessive [as] to indicate passion, partiality, or corruption.' " *Gomez v. The Finishing Co.*, 369 Ill. App. 3d 711, 722 (2006) (quoting *Franz v. Calaco Development Corp.,* 352 Ill. App. 3d 1129, 1138 (2004)). Because "the determination of damages is a function for the jury, we will not lightly substitute our judgment for that of the jury on this issue" (*Svec v. City of Chicago*, 2024 IL App (1st) 230893, ¶ 90), and "we will not reverse a jury's determination as to the amount of punitive damages unless it is against the manifest weight of the evidence." *Baumrucker,* 2017 IL App (1st) 161278, ¶ 75. Further, as for Contegra's general assertion that the court erred when it denied Contegra's motion for remittitur, we review the trial court's ruling for an abuse of discretion. *Hoffman v. Northeast Illinois Regional Commuter Railroad Corp.*, 2017 IL App (1st) 170537, ¶ 53.

¶ 149 As for Contegra's constitutional challenge, "the due process clause of the fourteenth amendment prohibits grossly excessive or arbitrary punishments on a tortfeasor because they serve

no legitimate purpose and constitute an arbitrary deprivation of property." *Baumrucker*, 2017 IL App (1st) 161278, ¶ 76. The United States Supreme Court outlined three "guideposts to determine whether an award of punitive damages by a jury comports with due process: (i) the degree of reprehensibility of the conduct, (ii) the disparity between the harm or potential harm suffered by the plaintiff and the amount of punitive damages awarded, and (iii) the difference between the punitive damages awarded and the civil penalties authorized or imposed in comparable cases." *Id.* ¶ 77. To evaluate the "degree of reprehensibility of the defendant's conduct," we consider: "(i) the harm caused was physical as opposed to economic; (ii) the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; (iii) the target of the conduct had financial vulnerability; (iv) the conduct involved repeated actions or was an isolated incident; and (v) the harm was the result of intentional malice, trickery, or deceit, or mere accident." *Id.* ¶ 78. We review a constitutional challenge to an award of punitive damages *de novo*. *Koehler v. Packer Group, Inc.*, 2016 IL App (1st) 142767, ¶ 87.

¶ 150   Applying the principles above, the jury's punitive damages award was not against the manifest weight such that it was against Illinois law and the jury's award did not violate Contegra's constitutional due process rights. As for Contegra's constitutional challenge, AIW was financially vulnerable. AIW presented evidence to support that Contegra's conduct caused AIW to file for bankruptcy, close its business, and move out of its facility where it had been for 50 years. Further, Contegra's conduct involved several actions during the course of the parties' business relationship, and was not just an isolated incident.

¶ 151   The evidence was also sufficient to support the jury's finding that Contegra's conduct was willful. The jury heard Contegra and AIW present extensive evidence about Contegra's conduct during the course of the parties' dispute, including its repeated requests to AIW to ship the steel

without making any further payments, its actions relating to the new fabricator, its representations to AIW that it was interested in resolving the dispute and would pay AIW if reasonably satisfied with the inspection at a time when it had already arranged for a new fabricator, its conduct related to the UCC-1, and its statements about AIW made to the CDB. After hearing the parties' extensive evidence, the jury determined that Contegra's conduct was willful and warranted the imposition of punitive damages. The record supports the jury's finding, and it was not against the manifest weight of the evidence. See *Gomez*, 369 Ill. App. 3d at 722 ("After hearing evidence in support of both sides, the jury's factual finding that punitive damages were warranted by defendant's willful or malicious acts was not against the manifest weight of the evidence.").

¶ 152    As for the disparity between the harm suffered by AIW and the amount of punitive damages awarded, Contegra asserts that the $5 million punitive damages award is unconstitutional and violates Illinois law because it is more than 10 times the actual damages incurred by AIW, as the unpaid invoices on the contractual dispute totaled $488,235. The jury awarded AIW a total of $1,508,753 in compensatory damages on its claims for fraud, trespass, wrongful replevin, defamation, and slander of title. The $5 million punitive damages award is about 3.3 times more than the compensatory damages. We therefore disagree with Contegra's contention that the jury's punitive damages award violates its constitutional rights because it is 10 times more than the actual damages AIW incurred. See *Mook v. Johnson*, 2018 IL App (3d) 170229, ¶ 31 (where the court found the jury's punitive damages awards were appropriate even though they were 3.88 and 5.66 times the amount of compensatory damages, it stated the "United States Supreme Court declined to impose a bright-line ratio between punitive and compensatory damages but hinted that punitive damages in the single-digit ratio will generally satisfy due process") (citing *State Farm Mutual Automobile Insurance Co. v. Campbell*, 538 U.S. 408, 425 (2003)). Further, under Illinois law,

"the amount of punitive damages imposed on a defendant does not have to bear any particular proportion to the size of the plaintiff's compensatory recovery." *Baumrucker*, 2017 IL App (1st) 161278, ¶ 81.

¶ 153 Accordingly, based on the evidence presented, the jury's award of $5 million in punitive damages is not excessive or unjustified and is not against the manifest weight of the evidence. The court did not err when it denied Contegra's motion for judgement notwithstanding the verdict and its motion for remittitur.

¶ 154 Trial Court's Evidentiary Rulings

¶ 155 Contegra contends that it is entitled to a new trial because the trial court made improper and prejudicial evidentiary rulings.

¶ 156 A trial court's evidentiary rulings will not be reversed absent an abuse of discretion. *People v. Caffey*, 205 Ill. 2d 52, 89 (2001). A trial court abuses its discretion where its "decision is arbitrary, fanciful, or unreasonable, or where no reasonable person would agree" with its position. *Control Solutions, LLC v. Elecsys*, 2014 IL App (2d) 120251, ¶ 38.

¶ 157 Contegra first asserts that the court erred when it allowed into evidence the settlement discussions related to the replevin case and the agreed order. It asserts that evidence of settlement discussions was irrelevant and inadmissible.

¶ 158 "As a general rule, offers of compromise or settlement are inadmissible at trial." *King Koil Licensing Co. v. Harris*, 2017 IL App (1st) 161019, ¶ 71. This evidence is "discouraged because it might be construed as an admission of liability and because public policy favors compromise." *Hana v. Illinois State Medical Inter-Insurance Exchange Mutual Insurance Co.*, 2018 IL App (1st) 162166, ¶ 29. Under Illinois Rule of Evidence 408, "while evidence of settlement offers and

negotiations are generally inadmissible, such evidence may be admitted for 'permissible purposes,' one of which is 'establishing bad faith.' " *Id.* (quoting Ill. R. Evid. 408 (eff. Jan. 1, 2011)).

¶ 159   Initially, we note that Contegra does not direct this court to the specific testimony in the transcript where the trial court improperly allowed evidence of settlement discussions over its objections. See Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020) (appellant's brief must contain the "contentions of the appellant and the reasons therefor, with citations of the authorities and the pages of the record relied on"); see *Hall v. National Freight, Inc.*, 264 Ill. App. 3d 412, 425 (1994) ("the failure to properly object to allegedly improper testimony waives the right to raise those matters on appeal"). To the extent that Contegra is challenging the testimony of AIW's vice-president, Robert Sutphen, regarding the email he received from Contegra's attorney on October 29, 2012, its argument is forfeited, as it did not object when this testimony was introduced. See *Steele v. Provena Hospitals,* 2013 IL App (3d) 110374, ¶ 40 (To preserve an error for review, "[a] party may not rely on a court's ruling on a motion *in limine,*" and it "must object the first time the testimony is introduced").

¶ 160   Contegra next asserts that the court allowed several witnesses to improperly testify about their legal conclusions relating to the propriety of the replevin orders and the issues in this case. Generally, "[e]xpert testimony is admissible when the expert has knowledge or experience not common to a layperson and that knowledge or experience would aid the trier of fact in determining the facts at issue." *Martin v. Sally*, 341 Ill. App. 3d 308, 315 (2003). "When determining whether proffered expert testimony assists the trier of fact, it is well settled that 'expert testimony as to legal conclusions that will determine the outcome of the case is inadmissible.' " *Todd W. Musburger, Ltd. v. Meier*, 394 Ill. App. 3d 781, 800 (2009) (quoting *Good Shepherd Manor Foundation, Inc. v. City of Momence,* 323 F.3d 557, 564 (7th Cir. 2003)).

¶ 161   Contegra asserts that the court improperly allowed AIW's attorneys, Massimino and Factor, to testify about their legal conclusions regarding the replevin case and agreed order, and that it improperly allowed Altshul, AIW's expert in financing, to testify about the impropriety of the UCC-1 and the ultimate legal issues of Contegra's liability on AIW's wrongful replevin and slander of title claims. Contegra does not direct us to any specific testimony in the record where the witnesses improperly testified about their legal conclusions over Contegra's objections. See Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020); *Hall*, 264 Ill. App. 3d at 425.

¶ 162   We note that, as for Altshul's testimony about the UCC-1, Contegra did not object when he testified that he did not see anything in the materials to support Contegra's assertion contained in its replevin complaint that it held a "properly perfected, first prior security interest in the materials, including as a result of filing a UCC financing statement." Contegra therefore forfeited its argument that Altshul provided an improper legal conclusion because it failed to object to the testimony when it was offered. See *Spurgeon v. Mruz,* 358 Ill. App. 3d 358, 360-61 (2005) (To preserve an issue for review, "[a] party must make a timely objection," which "requires that objections to evidence be made at the time the evidence is offered or as soon as grounds for the objection become apparent").

¶ 163   Contegra also asserts that the trial court improperly allowed Massimino to testify about "false allegations" that Contegra allegedly made in the replevin complaint. AIW responds that Contegra opened the door to Massimino's testimony on this issue. We agree that Contegra opened the door to the admission of the evidence. See *People v. Harris*, 231 Ill. 2d 582, 588 (2008) ("There is no question that a defendant can open the door to the admission of evidence that, under ordinary circumstances, would be inadmissible."). During cross-examination, Contegra's counsel asked Massimino if he had any personal knowledge that Contegra "ever made any false statements during

the replevin hearings" to which he responded, "[n]othing that comes to mind." Then, on redirect, AIW's counsel asked Massimino whether the statement in the replevin complaint that Contegra held a "properly perfect, first prior security interest in the materials, including as a result of the filing a UCC-1" was a false statement. The court overruled Contegra's objection, stating that the "[t]he door has been opened." The court did not abuse its discretion when it allowed the testimony.

¶ 164                                      AIW's Cross-Appeal

¶ 165   Following trial, AIW filed its petition seeking $3,911,298.26 in attorney fees and costs. The contract between AIW and Contegra expressly states:

> "In the event AIW must take legal action to collect amounts due on this account, to enforce the terms of this agreement or for any matter related to this project, the customer agrees to pay all reasonable AIW attorneys' fees, court costs, service/filing costs, AIW employee costs, AIW's subcontractor/vendor late payment interest at 2% per month until paid in full and their reasonable attorney fees, and all other costs incurred by AIW. This transaction shall be governed by the Laws of the State of Illinois, and jurisdiction and venue for hearing in any matter in dispute shall at AIW['s] election, be with the Circuit Court of Cook County, Illinois."

¶ 166   AIW alleged in its petition that its trial counsel, Edward Moor, spent 664.05 hours working on the case, at a rate of $572 per hour, for a total of $379,836.60. Moor's timesheet identifying the hours spent on this case were included in the petition. AIW additionally sought $2,939,406.80 in attorney fees pursuant to AIW's contingency fee agreement with Moor. In that agreement, AIW had agreed to pay Moor 40% of the jury's damages award if AIW won at trial.

¶ 167   AIW also requested $306,832.87 in "employee time" and expenses of Sutphen, who allegedly spent 3,660.1 hours on the litigation at a "rate of $68 an hour times the 20% multiplier

allowed by his contract." It requested fees for hotel costs, consulting an accountant, the mediator's fee, and other costs associated with the Madison County case.

¶ 168   In response, Contegra argued that AIW could not recover contingent attorney fees because the requested amount was not reasonable when it drastically surpassed the lodestar amount, the fee-shifting provision did not permit recovery of certain fees AIW was requesting, AIW's costs were unreasonable, and AIW was not entitled to recover fees from the Madison County case.

¶ 169   The parties conducted limited discovery related to the fee petition, including the taking of Sutphen's discovery deposition. Contegra subsequently withdrew its request for an evidentiary hearing, arguing that the discovery conducted reaffirmed that AIW's requests were impermissible, and that AIW's evidence was unreliable and unreasonable.

¶ 170   Following a hearing, the trial court issued a fee order granting in part and denying in part the fee petition. The trial court granted AIW's petition for attorney fees in the amount of $379,836.60, based on the lodestar method for the 664.05 hours of AIW's counsel's work at a rate of $572 per hour. The court also awarded AIW court costs in the amount of $337. It denied AIW's request for the contingency attorney fees and for additional costs. This cross appeal followed.

¶ 171                    Reasonableness of Attorney Fees

¶ 172   On appeal, AIW first argues that the trial court erred when it awarded AIW $379,836.60 in attorney fees based on the lodestar method and declined to award attorney fees based on the contingency fee agreement between AIW and Moor. Contegra maintains that the trial court did not abuse its discretion in awarding attorney fees.

¶ 173   "The general rule is that an unsuccessful party in a lawsuit is not responsible for the payment of the other party's attorney fees." *Myers v. Popp Enterprises, Inc.,* 216 Ill. App. 3d 830, 838 (1991) "However, a court may award attorney fees if they are expressly authorized by statute

or by agreement of the parties." *Collins v. Hurst*, 316 Ill. App. 3d 171, 173 (2000). The court will only allow fees that are reasonable. *LaHood v. Couri*, 236 Ill. App. 3d 641, 648 (1992). "[A]n attorney is entitled to be paid for the value of the services rendered as shown by the evidence." *Alton Banking & Trust Co. v. Schweitzer*, 121 Ill. App. 3d 629, 635 (1984).

¶ 174   To determine a reasonable fee award, a court must consider: (1) "the skill and standing of the attorney employed"; (2) "the nature of the cause"; (3) "the novelty and difficulty of the questions"; (4) "the amount and importance of the subject matter"; (5) "the degree of responsibility in the management of the cause"; (6) "the time and labor required"; (7) "the usual and customary charges in the community"; and (8) "the benefits resulting to the client." *Ashby v. Price*, 112 Ill. App. 3d 114, 122 (1983). "A court should also consider the nature of the attorney fee agreement between the successful litigant and his or her attorney." *Collins*, 316 Ill. App. 3d at 173. An attorney fee award is within the circuit court's discretion and will not be disturbed unless an abuse of discretion occurred. *Id*. "A court abuses its discretion when no reasonable person would take its view." *City of McHenry v. Suvada*, 2011 IL App (2d) 100534, ¶ 17.

¶ 175   Here, the trial court reached the fee award of $379,836.60 by using the lodestar method, which contemplates judicial assessment of the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate. *Robinson v. Point One Toyota*, 2017 IL App (1st) 152114, ¶ 31. The lodestar method "is the preferred method for determining a reasonable fee." *Id*. AIW acknowledged that Moor spent 664.05 hours preparing and trying the instant case. AIW further acknowledged that with an hourly rate compensation of $572 per hour, the total attorney fees for Moor would be $379,836.60. Moor was entitled to be paid for the services rendered as shown by the evidence. *Alton Banking & Trust Co.*, 121 Ill. App. 3d at 635.

¶ 176   Furthermore, the court noted in its order that it had considered: (1) the time and labor required by Moor, and the 664.05 hours expended; (2) the novelty and difficulty of the questions, and that this was a complex case with seven theories submitted by AIW to the jury and the defense of a counterclaim; (3) the skill required to perform the legal services and the experience, reputation and ability of counsel; and (4) the amount involved and the results obtained. It also noted that it considered the briefs and exhibits filed by the parties. While acknowledging "the proposition that Illinois courts permit an award of attorney's fees against the losing party based on the contingency fee contract between the prevailing [] party and its attorney," the court found that nevertheless, "the trial court has broad discretion to award attorney's fees and is exercising its discretion and relying on the lodestar method of determining reasonable attorney's fees in the instant case." We do not find that the trial court abused its discretion in coming to that conclusion.

¶ 177   AIW maintains, however, that its 40% contingency agreement with Moor was reasonable because AIW was "at the mercy of Contegra's aggressive litigation practices against AIW in various suits in multiple venues." This does not explain why it would have been reasonable to award Moor almost seven times the amount of attorney fees that he actually incurred. Moreover, this court has held that "courts are to consider the contractual fee arrangement between attorney and client as but one factor in their determination." *Renken v. Northern Illinois Water Co.*, 191 Ill. App. 3d 744, 752 (1989); see also *Collins*, 316 Ill. App. 3d at 173. The trial court considered the contingency fee agreement between AIW and Moor and rejected it, which was not an abuse of discretion.

¶ 178   AIW's reliance on *Blankenship v. Dialist International Corp.*, 209 Ill. App. 3d 920 (1991), and *Computer Sales Corp. v. Rousonelos Farms, Inc.,* 190 Ill. App. 3d 388 (1989), does not convince us otherwise. In *Blankenship*, a sales representative sought recission of a distributorship

agreement and for damages. 209 Ill. App. 3d at 923. The trial court awarded summary judgment for the sales representative in the amount of $5,000 and awarded attorney fees in the amount provided for in the contingency fee agreement – one third of the amount recovered. *Id*. On appeal, defendants claimed in part that the contingency fee of one-third of $15,000 was unreasonably high and should be limited to $3,100 in hourly fees proven by the plaintiff's attorneys. *Id*. at 926.

¶ 179    The *Blankenship* court noted that the trial court had found that the contingency fee contract of one-third of the amount recovered, was "the normal contingency fee contract in this community." *Id*. at 927. The court therefore found that the trial court had not abused its discretion in awarding the contingency fee amount of $5,000 as reasonable attorney fees. *Id*.

¶ 180    In the case at bar, the hourly fees provided by Moor amounted to $379,836.60. The 40% contingency fee would have resulted in nearly $3 million to be paid to Moor – a difference of over $2.5 million. In *Blankenship*, the difference between the hourly fee amount provided and what the trial court ultimately awarded was less than $2,000. It was also based in part on the fact that one third of the amount recovered was the norm in that community. *Id*. In making its finding, the court specifically noted that "courts are to consider the contractual fee arrangement between attorney and client as but one factor in their determination." *Id*. Here, the contingency agreement was but one factor used in the trial court's determination of attorney fees, and there was no evidence presented indicating that a 40% contingency fee agreement was the norm.

¶ 181    In *Computer Sales*, the plaintiff hired two separate law firms to try the case. 190 Ill. App. 3d at 392. The first firm was billed on an hourly basis for work performed and it submitted that the plaintiff owed it $4,825.69 for that work. *Id*. at 392-93. The plaintiff submitted an invoice for the other firm indicating the total time spent on the litigation, and an agreement to pay the firm one third of any amount recovered. *Id*. at 393. The jury awarded the plaintiff $24,730 in attorney

fees. *Id*. The trial court reduced the fees awarded by $9,550, finding that it would be inequitable to require the defendant to reimburse the plaintiff for both sets of attorney fees. *Id*. On appeal, the court held that the plaintiff was entitled to be reimbursed for the attorney fees it incurred even though it used two separate attorneys. *Id*. at 394. The court noted that it could not determine whether the evidence at trial was insufficient to show the reasonableness of the attorney fees because there was no transcript in the record. *Id*.

¶ 182    *Computer Sales* is inapposite to the case at bar. There, the appellate court could not make sense of "why the trial court reduced the award by $9,550," and did not address the reasonableness of the fees. *Id*. n.2. Here, the trial court specifically addressed the reasonableness of the fees and fully explained why it used the lodestar method to calculate attorney fees, rather than relying on the contingency fee agreement between AIW and Moor.

¶ 183    AIW also asserts that if this court determines that the contract allows for a contingency fee agreement and that the 40% contingency fee agreement is reasonable, then AIW is necessarily entitled to reimbursement for: (1) attorney fees in the amount of 40% of the total postjudgment interest; and (2) attorney fees incurred in this appeal, since AIW "recovered" these amounts. Because we find that the trial court did not abuse its discretion in using the lodestar method to calculate reasonable attorney fees, rather than the 40% contingent fee agreement, it follows that AIW is not entitled to reimbursement for attorney fees in the amount of 40% of the total post-judgment interest and attorney fees expended in this appeal.

¶ 184                    Expert Witness and Litigation Expenses

¶ 185    In its fee petition, AIW sought $309,984.47 in expert witness expenses and $219,809.70 in miscellaneous litigation expenses. The trial court found that the contract between AIW and Contegra made no mention of expert witness fees and denied that request. It found that AIW was

entitled to $337 in filing costs but denied the other miscellaneous expenses. AIW contends on appeal that the trial court erred in applying "an overly narrow definition of the term 'costs' to deny AIW an award of expert witness fees and other litigation-related costs."

¶ 186   A prevailing party can only recover attorney fees if an express statutory or contractual provision permits them to do so. *Northbrook Bank & Trust Co. v. Abbas*, 2018 IL App (1st) 162972, ¶ 62. A trial court generally "has broad discretion to award attorney fees and its decision will not be disturbed on appeal absent an abuse of that discretion." *Id*. However, to the extent that a trial court "interpreted the terms of the contract, our review is *de novo*." *Id.* ¶ 61. If "the trial court applied the terms of the contract to the facts, our review is based on an abuse of discretion standard." *Id.*

¶ 187   In order to determine what was contemplated by the parties, we must look at the contract. *Insurance Benefit Group, Inc. v. Guarantee Trust Life Insurance Co.*, 2017 IL App (1st) 162808, ¶ 38. The provisions must be strictly construed and enforced at the trial court's discretion. *Northbrook Bank & Trust Co.,* 2018 IL App (1st) 162972, ¶ 62. "Under Illinois law, a written agreement is presumed to speak the intention of those who signed it, and the intention must be determined from the language used." *J.B. Esker & Sons, Inc. v. Cle-Pa's Partnership*, 325 Ill. App. 3d 276, 285 (2001). "Absent ambiguity, the intention of the parties is to be ascertained by the language of the contract and not by the construction placed on it by the parties." *Id.* "If a court can ascertain its meaning from the plain language of the contract, there is no ambiguity." *Id*. Here, the provision at issue in the contract states:

> "In the event AIW must take legal action to collect amounts due on this account, to enforce the terms of this agreement or for any matter related to this project, the customer agrees to pay all reasonable AIW attorneys' fees, court costs, service/filing costs, AIW

employee costs, AIW's subcontractor/vendor late payment interest at 2% per month until paid in full and their reasonable attorney fees, and all other costs incurred by AIW. This transaction shall be governed by the Laws of the State of Illinois, and jurisdiction and venue for hearing on any matter in dispute shall at AIW['s] election, be with the Circuit Court of Cook County, Illinois."

¶ 188   The plain language of this fee-shifting provision in the parties' contract does not address expert witness fees. AIW contends, however, that the "all other costs incurred by AIW" language encompasses expert witness fees. We find *J.B. Esker & Sons, Inc. v. Cle-Pa's Partnership*, 325 Ill. App. 3d 276 (2001), instructive. In that case, the contract between the parties allowed the prevailing party " 'to recover reasonable attorney's fees, costs, charges, and expenses expended or incurred.' " *Id*. at 285. The court found that the term "charges" did not seem to encompass expert witness expenses, but that "expenses" did encompass expert witness expenses. *Id*. The court relied on Illinois Supreme Court Rule 219(e) (Ill. S. Ct. R. 219(e) (eff. Jul. 1, 2002), which permitted a court to require a party voluntarily dismissing a claim to pay an opposing party reasonable expenses including discovery expenses and opinion witness fees. *Id*. The court ultimately found that the fees of expert witnesses were fairly contemplated as an "expense" of litigation. *Id*. at 287.

¶ 189   In contrast, in the case at bar there was no mention of "expert witness expenses" or even "expenses" in the contract between AIW and Contegra. We are unwilling to read expert witness expenses into the "all other costs incurred by AIW" language in the statute. *Id*. at 285 ("If a court can ascertain its meaning from the plain language of the contract, there is no ambiguity.").

¶ 190   AIW next argues that the trial court erred in awarding it only $337 in court costs (the costs of filing the case and the cost of service of summons) and denying other miscellaneous expenses. It contends that the "remaining requested costs are encompassed by the catch-all provision" in the

contract between AIW and Contegra that states the prevailing party is entitled to "all other costs incurred." AIW does not specify what costs are included in the "remaining requested costs." Rather, in a footnote, AIW contends that the "remaining requested costs" are cataloged in two affidavits from Moor located at two different places in the record, spanning over 100 pages. We remind AIW that we are entitled to have the issues on appeal clearly defined, and a cohesive legal argument presented. *Express Valet, Inc. v. City of Chicago*, 373 Ill. App. 3d 838, 855 (2007). The appellate court is not a depository in which a party can dump the burden of argument and research. *Id*. "An issue not clearly defined and sufficiently presented fails to satisfy the requirements of Illinois Supreme Court Rule 341(h)(7) and is, therefore, waived." *Id*.; Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020). Here, we cannot glean from AIW's brief what the "remaining requested costs" are, and therefore this argument is waived.

¶ 191                                  Employee Costs

¶ 192   AIW contends that the trial court erred in denying AIW's reimbursement for "AIW employee costs" incurred by Sutphen, which allegedly comprise $299,533.20 for Sutphen's time, $6,497.49 in mileage costs, $445.20 in tolls paid, $1,806.95 in parking fees, and $148.05 in "other costs." He requests we reverse the trial court's denial of AIW's employee costs and enter judgment awarding AIW $299,533.30 in AIW employee costs.

¶ 193   AIW argues in its reply brief that the contract between the parties "includes 'AIW employee time' in a list which includes attorney fees, court costs, and service/filing costs." However, the contract does not include the term "AIW employee time." Rather, it states that "[i]n the event AIW must take legal action to collect amounts due on this account, to enforce the terms of the agreement or for any matter related to the project, the customer agrees to pay all reasonable AIW attorney fees, court costs, service/filing costs, AIW employee costs, ***, and all other costs

incurred by AIW." We must strictly construe contract provisions regarding attorney fees. *Northbrook Bank & Trust Co.*, 2018 IL App (1st) 162972, ¶ 61. The plain language of the fee-shifting provision does not provide for the value of the AIW's employee's time.

¶ 194    AIW contends that the trial court improperly required evidence that AIW actually reimbursed Sutphen for his time and that it needed to show only the full bill of costs. See *Wills v. Foster*, 229 Ill. 2d 393, 415-16 (2008). AIW asserts that its bylaws show that Sutphen's costs are chargeable to AIW and that AIW was obligated to reimburse him for the full amount of his time. There is no evidence that Sutphen's costs are chargeable to AIW or that AIW is obligated to reimburse Sutphen for the value of the time he has spent on litigation in this matter. The bylaws state that AIW is obligated to "indemnify any person who was or is a party *** by reasons of the fact that he or she is or was a director of the Corporation *** if such person acted in good faith and in a manner he or she reasonably believed to be in or not opposed to the best interests of the Corporation." However, Sutphen was not a party in this case, so AIW is not obligated under the bylaws to reimburse him in this action. Accordingly, the trial court properly denied AIW's claim for costs incurred by Sutphen.

¶ 195                    Madison County Case Costs

¶ 196    AIW contends that the court should have awarded AIW costs and fees it incurred in the Madison County case. In that case, Contegra brought fraud claims against Sutphen individually. The jury found for Contegra on one count and for Sutphen on the other count. AIW is seeking $9,831.42 in fees and costs related to that case. Contegra responds that the language of the contract between the parties did not allow for the Madison County costs and fees. We agree.

¶ 197    We initially note that AIW specifically recognized it was not entitled to Madison County fees and costs in a response to Contegra's motion to exclude evidence. Therein, AIW stated that

"fees for Madison County will not be sought" in part because "the action was not brought by AIW to enforce the agreement" and "the alleged fraud in Count II in Madison County could not have been within the contemplation of the parties at the time of contracting."

¶ 198    Further, we reiterate that, absent ambiguity, the intention of the parties is to be ascertained by the language of the contract and not by the construction placed on it by the parties. *J.B. Esker*, 325 Ill. App. 3d at 285. A provision for attorney fees in a contract must be strictly construed and enforced. *Northbrook Bank & Trust Co.*, 2018 IL App (1st) 162972, ¶ 62. The plain language of the contract states in pertinent part that "[i]n the event AIW must take legal action to collect amounts due on this account, to enforce the terms of this agreement or for any matter related to this project, the customer agrees to pay all reasonable AIW attorney fees, ***." The Madison County case was not a case where AIW had to take legal action. Rather, Contegra brought the action, and it was against Sutphen as an individual, not AIW.

¶ 199    AIW's reliance on *Northbrook Bank & Trust Co. v. Abbas*, 2018 IL App (1st) 162972 (2018), does not persuade us otherwise. In *Northbrook*, the fee-shifting provision in the contract specifically provided for the recovery of fees related to the enforcement of "other documents executed in connection with the Agreement." *Id*. ¶ 71. The primary lawsuit stemmed from a breach of a loan agreement wherein the loan recipients pledged four mortgages as collateral. *Id*. ¶ 3. Each of those mortgages resulted in separate foreclosure litigation suits. *Id*. ¶ 19. At the conclusion of the loan agreement suit, the bank sought attorney fees for the work in that case as well as the related foreclosure cases. *Id*. The appellate court found that the language of the fee-shifting provision stating that fees related to enforcement of "other documents executed in connection" with the loan agreement was broad enough to encompass the four mortgages that had been used as collateral in the loan agreement. *Id*. ¶ 69.

¶ 200   Here, there is no such language that would encompass the Madison County case – a case that Contegra brought against Sutphen individually for fraud. Accordingly, we find that the trial court properly found the Madison County fees and costs not recoverable.

¶ 201                              Other Attorney Fees and Costs

¶ 202   AIW contends that we should reverse the trial court's order denying AIW an award for "other attorney fees," which "generally include the fees incurred *** in the myriad [of] other legal proceedings initiated by AIW or Contegra."

¶ 203   AIW first asserts that the requested costs do not include the attorney fees incurred by Massimino, who represented AIW in the replevin action, and Factor, who represented AIW in the bankruptcy action, because these fees were included as compensatory damages in the jury's verdict. It however states that these fees have not been paid, and it requests interest on the fees in the amount of $242,055.26. The plain language of the fee shifting provision does not provide for interest on attorney fees.

¶ 204   AIW next asserts that "other fees" that remain outstanding include the fees incurred by Voelker Litigation Group, who initially represented AIW in this action as well as in the Madison County case, as well as Goodman Tovrov and Heyl, Royster who AIW hired for "necessary tasks," including serving as "Voelker's local counsel." Citing over 500 pages of the record, AIW contends that it presented invoices associated with each attorney as exhibits to Sutphen's affidavit. Again, we are entitled to have the issues on appeal clearly defined, and a cohesive legal argument presented (*Express Valet,* 373 Ill. App. 3d at 855) and "[a]n issue not clearly defined and sufficiently presented fails to satisfy the requirements of Illinois Supreme Court Rule 341(h)(7) and is, therefore, waived." *Id.*; Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020). AIW has failed to specify

or provide us with a summary of the fees it is requesting for each of the attorneys, and therefore this argument is waived.

¶ 205    Accordingly, the trial court did not err when it granted in part and denied in part AIW's petition for attorney fees and costs.

¶ 206                                    III. CONCLUSION

¶ 207    For the reasons stated, we affirm the judgment of the circuit court of Cook County.

¶ 208    Affirmed.